[Civ. No. 16465.   First Dist., Div. Two.   Oct. 17, 1955.]

BERNARD H. COOPER, Respondent, v. THE NATIONAL MOTOR BEARING COMPANY, INC. (a Corporation) et al., Appellants.

Boyd & Taylor for Appellants.

Jack H. Werchick for Respondent.

KAUFMAN, J.—This is an appeal from a judgment in favor of plaintiff after jury verdict in a malpractice action brought by respondent Bernard Cooper against Lillian Elson, a trained nurse employed by appellant, The National Motor Bearing Company, Inc., and against said company. Respondent Cooper was also an employee of the aforesaid company. A verdict in the sum of $25,000 in favor of respondent was returned by the jury. A motion for new trial was denied on condition that respondent would consent to a reduction

of the judgment to the sum of $15,000. Such consent was thereafter filed.

In May, 1951, Bernard Cooper, while engaged in the course of his employment for appellant company received a puncture wound on the left side of his forehead when another employee let a piece of metal slip from his hand. He went directly to the first aid room of the plant and received treatment from the nurse, Mrs. Lillian Elson. She swabbed the wound with mercurochrome or some other antiseptic and put a bandage on it. No one else was in the room. She did not ask him to sit down, but treated it while he was standing. According to respondent's testimony she did not examine or probe the wound, but just swabbed and bandaged it. He was told to return the next day which he did. Mrs. Elson again applied antiseptic but did not probe it. On the next day he also went to the dispensary, but on that occasion the nurse just looked at the wound.

The wound appeared to close up but left a little red mark about the shape of the cut. The redness did not go away until the operation. After about two or three months the redness began to spread, and the area became puffy and raised in about three or four months after the original injury. Respondent on visits to the dispensary in this period would point out to Mrs. Elson that the wound didn't seem to be healing properly and she would say if it didn't she would have to do something. Some months late a little scab started to appear in the center.

In March, 1952, respondent visited the dispensary for a check of a chest injury and asked Mrs. Elson if she would send him to a doctor to examine his forehead. She referred him to Dr. Arden Hedge who excised a piece of tissue for laboratory examination. Dr. Lindsay, a pathologist, examined the specimen and reported that it contained a basal cell carcinoma, and the carcinoma had not been fully removed by the excision. On March 23, 1952, respondent was operated on, and a larger area was excised. Skin was removed from his right forearm and grafted to the forehead. He was hospitalized for four days. The entire basal-cell carcinoma was removed in the second operation.

Respondent testified that he was absent from work for 35 days on account of the operation. He had headaches that continued from the time of the operation up to and including the time of trial. There was a feeling of tightness in his forehead, and when he combed his hair he experienced a

prickling sensation. There was some limitation of motion in his arm for some months after the skin was removed for the graft. He experienced considerable embarrassment because of the livid scar on his forehead the size of a half-dollar. There was testimony by Dr. Jesse Carr that respondent has the type of skin subject to this type of cancer, and that he will probably get more cancer in the area where the excision has been done.

Appellants contend that they were prejudiced because respondent was permitted to call as a witness Dr. Arden R. Hedge under authority of section 2055 of the Code of Civil Procedure, and over objection of counsel for appellants. They say that if Dr. Hedge had not so testified they would have been entitled to a nonsuit because there would have been no expert testimony on behalf of respondent, since a malignant and cancerous condition is a matter which requires expert testimony. Respondent did not wish to call the doctor as his own witness because he wanted to elicit evidence that could only be gained on cross-examination. Respondent's case was tried on the theory that a foreign body was left in the wound by the negligence of the nurse, and that this foreign body acting as an irritant, caused the cancer. The only evidence of a foreign body occurs in the reports of Dr. Hedge to the appellant company's insurance carrier. Dr. Hedge, after he had made these reports, decided on further study that he had been mistaken in his first judgment that there had been a foreign body in the wound, and that the body which he had removed from it was a natural product of the body function of plaintiff. Dr. Hedge testified that cancer was not more likely to occur in a wound than in an area where there was no wound, that it could not be caused by a blow, cut, metal sliver or oil in a wound. Because the doctor was testifying under section 2055, respondent was able to impeach him by use of his earlier deposition.

It would seem that respondent is correct in his argument that appellants cannot claim they were prejudiced, because they could not have secured a nonsuit even if Dr. Hedge had not testified under section 2055. The testimony of Mrs. Elson, the nurse, established the standard of care in the community for nurses, and the reports of Dr. Hedge of his diagnosis and treatment of the wound, and the company's records showing that the cancer resulted from an industrial accident, would have been sufficient evidence to compel the denial of a nonsuit.

In *Estate of McDonald*, 191 Cal. 161 [215 P. 545], in which it was argued that a certain witness should not have been examined as an adverse party under section 2055, Code of Civil Procedure, it was said that no prejudice resulted since the witness was competent to testify in the case regardless of section 2055, and it was not shown that any evidence elicited was inadmissible under the general rules of evidence.

The facts on which it was decided to permit the doctor to testify under section 2055 were as follows: The appellant company employed registered nurses to operate a first aid dispensary at their plant; employees were instructed to report to this dispensary if injured while at work; nurses may practice only "in conjunction with curative or preventive medicine as prescribed by a licensed physician" (Bus. & Prof. Code, § 2725); the appellant nurse worked under standing orders that were drawn up and signed by Dr. Arden Hedge; in event the injury was beyond the scope of the nurse's practice, she was required to send employees to a doctor who was on the company's panel; Dr. Hedge had an understanding with the company that he would accept as patients all employees sent to him by the company; the doctor's services were paid for by the company through their insurance carrier; the employees always had to see the nurse first in order to get referred to the doctor; when employees went to the doctor they were to go for the specific purpose for which the nurse had referred them.

From the facts that trained nurses in operating a dispensary for the appellant company, necessarily must do so under general directions furnished by a licensed physician, that in this case such directions or "Standing Orders" were signed by Dr. Hedge, that he had an understanding that he accept all employees referred to him, an inference could reasonably be drawn by the trial court that he was an agent of appellant company in the carrying out of their medical program. The trial court's decision on this point is adequately supported by substantial evidence.

It is next contended that the evidence is insufficient to support the verdict. Respondent's complaint alleged that he received an injury in the scope of his employment on May 11, 1951, consisting of a laceration of his forehead, for which he was treated by defendant Lillian Elson, that he was continuously treated therefor until March, 1952, when he was instructed by defendants to secure further treatment from a licensed physician and surgeon. He then learned

for the first time, it is alleged, "that the lacerated injury to the forehead had become infected and that a malignant condition had developed in the aforesaid infected area," that respondent underwent two surgical operations for the treatment of the malignant condition, and that the malignant condition is permanent.

Appellants point out that there is no evidence of an infected condition, as alleged, and therefore to support the judgment there must be substantial evidence that the malignant condition was caused by the alleged malpractice of the nurse. Appellants maintain that although respondent claims that a metal splinter was allowed to remain in the wound by the appellant nurse, there is no evidence whatever in the record to support this claim. It is true that Dr. Hedge denied at the trial that the object was metal, saying that it was hard and looked like plastic. At the time of trial, after having consulted with Dr. Jesse Carr, he then believed that it was a cartilagenous substance that had been formed by the respondent's own body functions. However, when he was making the report to the Industrial Accident Commission, after receiving the pathologist's report, he then characterized the object found in the wound as a foreign body, "a small irregular shaped hard object." He stated that at the time he made the report he then believed it to have come from outside respondent's body, rather than having been formed within the wound. The object was not included in the specimen sent to the laboratory for the reason that it slipped from the doctor's hand when he was examining it, and he could not thereafter locate it. The doctor denied at the trial that the object was metal. In the report of the industrial accident Dr. Hedge stated that there was a possibility that the foreign body caused the cancerous lesion. At the trial he admitted that it was possible that a wound with an irritant in it would be more apt to develop cancer than a wound with no irritant in it.

Appellants contend that Dr. Hedge's testimony that a foreign body did not exist is reinforced by Dr. Carr's testimony that where there is a foreign body, giant cells will form in the area of the foreign material, and that such giant cells were not present here before the first operation. That is of course the testimony of one medical expert. But it, as well as Dr. Hedge's later testimony, merely establishes a conflict with Dr. Hedge's earlier report that the wound contained a foreign object.

There was testimony that the basal cell carcinoma was of the slow-growing type. Dr. Carr testified that such a tumor would take 1.9 years to grow to the size it was when excised. He based this on statistics gathered on this type of tumor at San Francisco County Hospital, saying that tumors of this size will develop on an *average* of 1.9 years, adding "you can give or take whatever you want on that." Dr. Hedge at the trial said that it would take two or three years for a cancer to grow to the size this one was at the time of the operation, although in his earlier reports he had said that it was possibly caused by a foreign object in the wound.

Dr. Hedge had in his deposition taken prior to trial stated that a person who has a wound with an irritant in it would be more apt to get cancer than a person who had a wound with no irritant in it.

The appellant nurse admitted that it was her duty to refer any condition or injury she was not familiar with, or not sure about, to a doctor for diagnosis. The standard of good nursing care in the community required the nurse to examine the wound for foreign bodies. If splinters were too deeply imbedded, the nurse was to send the workman to the doctor. Respondent's type of wound should normally have healed in a week or so. If a wound persisted and did not heal, proper nursing care would require that the workman be sent to the doctor, for such a condition would indicate to a nurse that something was wrong. Appellant nurse admitted that she was familiar with the seven danger signals of cancer, one of which is "any sore that does not heal." Nevertheless, she continued to treat the wound for 10 months before sending respondent to the doctor. In *Valentin* v. *La Societe Francaise*, 76 Cal.App.2d 1, 7 [172 P.2d 359], it was said that the negligence of the hospital in that case was established "by evidence of the inaction of the nurses in the presence of signals of danger which would have moved a reasonably intelligent attendant promptly to import a competent physician for the purpose of taking necessary precautions to prevent the development of the disease."

Respondent herein had never had any prior skin trouble, had had no prior injury to his forehead, and had no personal history or family history of cancer. The area from which the cancer was later removed was in the very area where he had received the injury 10 months earlier. It is true that there was testimony that respondent has a type of skin which is more subject to cancer than are other types. But

respondent's testimony shows that prior to this injury he was not afflicted with that disease. In *Austin* v. *Red Wing Sewer Pipe Co.*, 163 Minn. 397 [204 N.W. 323], a case wherein an employee had developed a cancer on his cheek in the area where he had been injured, it was said that that circumstance was pretty strong evidence that the injury was the proximate cause of the result, and that if the medical profession did not know the cause of cancer, "the connecting events between the cause and effect . . . might be sufficient to justify the conclusion that the injury was the legal cause, and that the result should be compensable." (And see *Hagy* v. *Allied Chemical & Dye Corp.*, 122 Cal.App.2d 361 [265 P.2d 86].)

It was said in *Fireman's Fund etc. Co.* v. *Industrial Acc. Com.*, 93 Cal.App.2d 244, 246 [208 P.2d 1033], that "expert evidence of a medical possibility taken with other evidence of a nonexpert character may be sufficient to support an inference of medical probability." The jury may have concluded from the evidence herein that the nurse did not carefully probe the wound for foreign matter, that this caused the cancer in respondent's skin which was a type of skin subject to cancer. They may well have concluded that the delay in sending respondent to the doctor made necessary the excision of a much larger area, and hence a greater disfigurement than he would have suffered, if he had been referred when the wound had failed to heal within the normal period. The public has been educated to the importance of the early detection of cancer so that the average layman knows that if detected early, surgery will affect a much smaller area than if detected in later stages.

There is no merit in the contention that respondent was guilty of contributory negligence as a matter of law because although concerned about the fact that the wound was not healing, he did not consult a doctor about it. The evidence shows that he continually consulted the nurse about it. He relied upon her for treatment. She kept assuring him that it was all right. It never occurred to him that he might have cancer, and since it was not disabling, he could continue his work as usual. Under the circumstances testified to herein, it was certainly a question of fact for the jury to decide whether or not respondent had been guilty of contributory negligence (*Polk* v. *City of Los Angeles*, 26 Cal.2d 519 [159 P.2d 931]).

Appellants attack the amount of the verdict as being excessive. The jury returned a verdict of $25,000, but the trial

judge granted a remission of everything in excess of $15,000 as a condition of denying a new trial. ▮ Therefore the verdict must be reviewed as if this latter amount had been returned in the first instance by the jury. (*Hughes* v. *Hearst Publications, Inc.,* 79 Cal.App.2d 703 [180 P.2d 419].)

▮ The damages suffered by respondent which have been previously reviewed above, justify the amount of the judgment. There is no showing that the verdict is the result of passion or prejudice. (See *Mudrick* v. *Market Street Ry. Co.,* 11 Cal.2d 724, 735 [81 P.2d 950, 118 A.L.R. 533].)

Appellants, in violation of proper procedure on appeal, raise an entirely new claim of error for the first time in their reply brief. It is contended that error was committed in giving the following instruction:

"A patient is entitled to an ordinarily careful physical examination, such as the circumstances, the condition of the patient, and the nurse's opportunities for examination will permit. If there is a reasonable opportunity for examination, and the nature of the injury or ailment can be discovered by the exercise of ordinary care and treatment, then the nurse is answerable for failure to make such discovery.

"The same degree of responsibility and the same duty of care is imposed upon a nurse in the making of a diagnosis as is imposed upon her in the prescribing and administering of treatment."

▮ It is argued that these instructions are taken from cases concerned solely with malpractice of physicians or surgeons, and not those where nurses are involved. The effect was, they say, to install the nurse in a position of equal responsibility with a physician for diagnosis, prescription and treatment, and to impose on her a duty to practice medicine from which she is prohibited by law, and that this instruction must have led to confusion in the minds of the jury. Appellants center their attack chiefly on the use of the word "diagnosis" and contend that the jury might be led to believe that the nurse was held responsible for diagnosing the malignant condition, when such diagnosis can be made with certainty only by a pathologist. In the present case, Dr. Hedge did not diagnose the case as a malignant growth until he had received reports from the pathologist.

However, we believe the jury properly understood the instruction to mean that a nurse's diagnosis of a condition must meet the standard of learning, skill and care, to which nurses practicing that profession in the community are held.

238

A nurse in order to administer first aid properly and effectively must make a sufficient diagnosis to enable her to apply the appropriate remedy. Usually she receives some history of the accident or illness from the patient, inspects a wound, and bases her choice of treatment on the deductions thus made. She has been trained, but to a lesser degree than a physician, in the recognition of the symptoms of diseases and injuries. She should be able to diagnose, according to appellant nurse's own testimony herein, sufficiently to know whether it is a condition within her authority to treat as a first aid case or whether it bears danger signs that should warn her to send the patient to a physician.

Since no doctor was involved as a defendant in this case, it is not probable that the jury confused the standards of diagnosis demanded from a nurse with those of a doctor. The jury was in fact instructed that "a nurse by law is not authorized to practice medicine or surgery or to undertake the prevention, treatment or cure of disease, pain, injury, deformity, or mental or physical condition in violation of any provisions of law."

Appellant nurse testified that it was the practice of a nurse in this type of industry to probe wounds for foreign bodies, that if there is a foreign body in a wound there is a feeling of sharpness on pressure, that according to the standard of care and her experience as a nurse, she should be aware of the possibility of foreign objects in such a wound.

The trial court also gave full and complete instructions on the duty, obligations and standard of care required of nurses.

Viewing the instructions as a whole, it appears that the jury was fully and fairly instructed.

Appellants in their supplemental answer to respondent's supplemental brief assert that there is error in several other instructions given by the court. "Matters presented for the first time in an appellant's closing or reply brief will not ordinarily be considered by the appellate court, in the absence of a meritorious reason for the delay" (4 Cal.Jur.2d 324, § 488), therefore appellants can hardly expect this court to consider these charges of error so belatedly urged with no excuse whatever offered for the delay.

No prejudicial error appearing in the record before us the judgment must be affirmed.

Judgment affirmed.

Nourse, P. J., and Dooling, J., concurred.