TOBRINER, J.
 

 The retrial of the instant case, ordered by this court on September 15, 1954 (127 Cal.App.2d 392)
 
 *225
 
 generates this appeal by Ocean Shore Railroad Company. Appellant (hereinafter designated “railroad”) contends that the judgment for respondents (hereinafter designated “Doelger”) fails because of the insufficiency of the evidence and erroneous rulings as to it. We examine these contentions; we state why we believe the judgment should be affirmed.
 

 The history of this railroad is spread upon the lawbooks of this state; indeed, since 1921, the railroad has operated solely in the sphere of litigation. To chart its long journey we describe, first, the history of the railroad and of the litigation in which it was involved prior to the date of the instant action and, thereafter, the additional facts disclosed at the trial.
 

 We begin with the 1909 conveyance by the old Spring Valley Water Company of a 60-foot surface right to Ocean Shore Railway Company over its San Mateo County lands. Planning a railroad from San Francisco to Santa Cruz, the company actually laid its tracks from San Francisco only as far as the remote coastwise town of Tunitas. In about 1910 it commenced operations. The next year the railway company’s properties were acquired by appellant railroad company.
 

 But the success of the venture, if any, was short-lived. In 1920 the railroad petitioned the California Railroad Commission to cease operations. Even in the twenties the pressure of ear and truck competition challenged the dominance of that erstwhile monarch of transportation, the railroad, and Ocean Shore stockholders were seven times assessed to meet financial losses. In February, 1921, the last train traversed the somewhat tortuous tracks of the Ocean Shore, and, soon after, the company disposed of tracks, ties and rolling stock, and it never again acquired them.
 

 The first chapter of litigation does not reach to the heart of our issue, but it is an important part of the history. Because of alleged encroachments, the railroad in 1922 sought to quiet its title to the right of way as against Spring Valley Water Company and Lake Merced Golf and Country Club. In that litigation defendants contended that the right of way abandoned by the railroad reverted to Spring Valley and its promisee Golf Club. Although Judge Hudner so declared, this court reversed the judgment.
 
 (Ocean Shore Railroad Co.
 
 v.
 
 Spring Talley Water Co.
 
 (1927), 87 Cal.App. 188 [262 P. 53].) Following retrial on January 15, 1930, Judge Buck signed a decree providing that “ [Ocean Shore] ‘is the owner
 
 *226
 
 in fee ... of a right-of-way for railroad purposes only over [. . .] . . .’ (The 60-foot strip above mentioned),” and that “the defendants . . . have no claim or interest ‘in and to the said right-of-way for railroad purposes only over said strip of land [. . .] or any part or parcel thereof or in or to any easement or right-of-way [. . .] and that the title [. . .] in and to the said right-of-way for railroad purposes only over said strip of land is free and clear of any right, title, claim [. . .] or interest of any character therein or thereover of the said defendants
 
 (Ocean Shore Railroad Co.
 
 v.
 
 Doelger
 
 (1954), 127 Cal.App.2d 392, 396-397 [274 P.2d 23].) Only the golf club appealed from the decree, and it contended solely that the evidence did not support the finding that, as to Ocean Shore’s right of way, the club was not a bona fide purchaser without notice. The Supreme Court, however, affirmed Judge Buck’s decree on April 27, 1933.
 
 (Ocean Shore R. R. Co.
 
 v.
 
 Spring Valley Water Co.
 
 (1933), 218 Cal. 86 [21 P.2d 588].)
 

 On January 2, 1945, Spring Valley Water Company conveyed its title to the Westlake area to Henry Doelger, who in turn conveyed to respondent corporation. Bespondent corporation commenced a subdivision of the property in 1947, built a lumberyard upon the railroad’s right of way, and, on March 7, 1950, Henry Doelger, as president of respondent corporation, wrote to the railroad as to the possibilities of the use of the railroad’s land for building purposes. In this regard, the railroad replied in part to Doelger on April 20, 1950: “ [I]n the course of our conversation Mr. Hemdren [a member of Doelger’s engineering department] stated that it seems doubtful that the railroad company would be able to give clear title to the above-mentioned lands .... Your impression in that regard is in error as the railroad company is in a position right now to give you a clear title in fee to any of the former Spring Valley Water Company land. The
 
 only reason
 
 they do not wish to do so at present is that on the Mussel Bock Bluffs litigation to be tried in Oakland the railroad is claiming, in said suit, heavy consequential and severance damages to the Spring Valley lands as the result of the taking of Mussel Bocks Bluff [sic].... The company is still disposed to negotiate . . . that your subdivision be laid out
 
 so that our land will he useful for building lot purposes
 
 after the termination of the condemnation litigation.” (Emphasis added.)
 

 Subsequently, when the railroad and Doelger became involved in a dispute, the railroad, on July 1, 1950, filed its
 
 *227
 
 complaint seeking to enjoin Doelger from trespassing upon the 60-foot right of way and the 70-foot area on either side of the right of way, and praying damages because of alleged injuries done to this land. Doelger’s cross-complaint of July 12, 1950, alleged that the railroad “has forfeited, lost and abandoned all interest in” the right of way. The issue was initially resolved by Judge Draper’s judgment which, in the words of Justice Bray in
 
 Ocean Shore Railroad Go.
 
 v.
 
 Doelger, supra
 
 (1954), 127 Cal.App.2d 392, “permanently enjoin [ed] defendants [Doelger] from entering upon, using or occupying the 60-foot strip. It decreed that the Buck decree is res judicata as to all issues of title between the parties and forever enjoins defendants from asserting any claim or interest ‘in and to the property described in that decree, or any easement therein or right-of-way thereover. ’ ” (P. 395.)
 

 When the ease came up on appeal, Justice Bray, in reversing the judgment “in its entirety” (p. 404), established the key question for resolution here: “The Draper decree is erroneous in declaring that plaintiff is the owner of the strip in fee simple absolute and in finding that defendants have no interest in it. Plaintiff is the owner in perpetuity of a right of way
 
 for railroad purposes only
 
 over the strip.” (Emphasis added; p. 400.) “The fact that the acts of plaintiff prior to 1930 did not constitute an abandonment of its easement is not, and cannot be, necessarily a determination that plaintiff’s acts subsequent to 1930 may not have amounted to an abandonment. The factual situation might be identical with that of 1930, in which case the Buck decree might be res judicata. On the other hand, the evidence indicates rather strongly that the situation has changed. The trial court should have determined this question and whether such abandonment, if found, caused a reversion. Involved in this question is the effect of the refusal of plaintiff to comply with the provision of the grant requiring the grantee ‘to construct and maintain, at its own expense, any and all crossing over said surface rights of way that the party of the first part [Spring Valley Water Co., respondent’s predecessor], its successors and assigns, may now, or at any time or times hereafter, require in its utilization of subdivision of its properties. . . .’ ” (P. 402.) “Plaintiff contends that the evidence shows that defendants have waived any reversionary rights they might have and also are guilt [y] of laches. The trial court, because of its other determination of the case in favor of plaintiff, made no finding upon this
 
 *228
 
 question. On the retrial, the court will be required to consider that contention.” (P. 403.)
 

 Following remand for trial, Daly City, on April 27, 1955, and the Roman Catholic Archbishop of San Francisco, on May 2, 1955, filed complaints in intervention, which alleged that these parties possessed interests in the litigated property. In answer the railroad denied such interest in Daly City and, further, alleged an estoppel because Daly City obtained an order of immediate possession in an eminent domain action and deposited in court a sum to cover such property. The railroad also denied the Roman Catholic Archbishop’s claim of interest via Doelger and, likewise, alleged an estoppel against the archbishop by reason of laches.
 

 Thus the remanded case, on February 14, 1956, proceeded to trial before Judge Dematteis. Upon this second examination of the issues additional evidence was adduced, and this we collect under the following classifications:
 

 1.
 
 The railroad’s liquidation.
 
 The railroad in 1930 applied to the Corporation Commission for a permit authorizing it to divide and distribute $65,554.57 in cash to its shareholders upon the basis that “said corporation is in liquidation, and has been since 1920, and is not engaged in, nor does it propose to engage in business of any kind other than such as is appropriate or incidental to such liquidation.”
 

 2.
 
 Rehabilitation work following condemnation actions.
 
 The railroad commenced rehabilitation work in 1933 only after the state had filed two condemnation actions against it; indeed, the state’s engineers were staking out their jobs while the railroad still engaged in such “rehabilitation” activities. Mr. Poss, the state’s construction engineer in charge of building Highway Number 1, testified he noted that the railroad utilized “no grade stakes, no side stakes, no cut and fill stakes . . . none of the engineering work that is always done before . . . construction”; that its efforts looked “extremely piddling”; that it “attacked points of least resistance, moved a little further here and there, and then gave it all up.” Merle Adams, who, in 1935 and 1936, worked for his father’s firm (Adams Construction Company) which did this rehabilitation work, stated that while some rock retaining walls were built, no mortar was utilized between the rocks, and that he was told by his father, “They don’t want them mortared.” And although Adams Construction Company spent four to six months in the Thorton-San Gregorio-Tunitas area, Adams stated: “We didn’t do much. ...” Mr. Smith, a civil engi
 
 *229
 
 neer, resident of San Mateo County since 1925, familiar with the railroad’s right of way, testified that the roadbed in the areas north of Pedro Point, Devil’s Slide, and south of Edge-mar had substantially deteriorated since 1930; that the rehabilitation work done by appellant was “of an extremely preliminary nature.”
 

 3.
 
 Growing crops.
 
 In the Westlake area Mr. Lagomarsino planted crops upon the railroad’s right of way from the time it ceased operating trains until respondent Doelger entered upon the scene. At no time did he see the railroad maintain or rehabilitate its right of way although he was in the area every day.
 

 4.
 
 Costs of reconstruction.
 
 Mr. Frank Guy, engaged as the maintenance of way engineer for Southern Pacific from 1938-1948 in charge of some 13,000 miles of its track, testified that the total cost of reconstructing the railroad from Skyline Boulevard and Alemany to Tunitas would be $5,205,000. Mr. Hunter, former Director of Transportation of the California Public Utilities Commission, attested that in light of the traffic tonnage available and the cost of rehabilitation it would be economically infeasible to restore service on the line; that trucks were replacing railroads; that the trend was toward abandonment rather than construction of railroads; that the San Franeisco-Napa-Calistoga railroad abandoned operations in approximately 1946 even though it ran through a fertile agricultural valley.
 

 5.
 
 Conveyances of the right of way.
 
 Around Half Moon Bay the railroad conveyed in 1924 approximately eight and one-half miles of its right of way to Giovanni Pera. In 1925 it conveyed almost 1,300 feet of its right of way to one Paul-sen. In the areas south of Tunitas out of approximately 23 miles of right of way the railroad has conveyed 12% miles. In the period 1935-1949 the state has filed some 13 condemnation actions against the railroad which involve 9% miles of its right of way between San Francisco County line and El Granada. Highway Number 1 has been constructed upon this 9% miles. Of this mileage approximately 3 miles were involved in
 
 People
 
 v.
 
 Ocean Shore Bailroad
 
 (1948), 32 Cal.2d 406 [196 P.2d 570, 6 A.L.R.2d 1179], wherein the Supreme Court denied severance damages to the railroad for any right of way below 'Sharp Park on the ground of its loss of the easement across Sharp Park itself. The railroad, however, cannot now resurrect such easement.
 
 (Bernhard
 
 v.
 
 Bank of America
 
 (1942), 19 Cal.2d 807, at pp. 812-813 [122 P.2d 892].) In the
 
 *230
 
 mid 1920’s the railroad also suffered several quiet title decrees in favor of Patroni, Dianda, and Skelly. Prior to 1930 it rid itself of all rights of way from 12th and Mission up to Ale-many and Junípero Serra Boulevard.
 

 6.
 
 The railroad’s attempted answers.
 
 While the railroad introduced testimony that during the 1930’s it had purchased properties and endeavored to obtain tonnage of ranch production through contract or lease, the court noted that proof of the relevant deeds, documents or contracts would have carried more weight. Although Mr. Middleton, the railroad’s general manager, stated that as part of its plans to construct a railroad it assumed it had a right of way across Sharp Park; that it planned to build the railroad “if and when” the state abandoned that portion of Highway No. 1 built upon its right of way, Mr. Middleton admitted that he had neither information from public officials nor any document that indicated an intent by the state to abandon the highway. He stated likewise that the railroad had no plan for financing the railroad. While in 1933 or 1934 the railroad had engaged Mr. MacDonald, a builder of motor vehicles, to work out plans for a special set of cars and locomotive, the railroad placed no order for such equipment.
 

 Judge Dematteis on September 28, 1956, decreed that the railroad had no interest in the 60-foot strip at the time the action commenced. The judgment also quieted the respective titles of Doelger, the Roman Catholic Archbishop and Daly City. The findings upon which the judgment rested declared in substance that Spring Valley Water Company had granted the property to the railroad upon certain conditions' “precedent, present and subsequent, ’ ’ which inured to the benefit of Spring Valley’s successors; that the railroad breached paragraphs b, c, and i of these conditions, which we set out in the footnote;
 
 [1]
 
 that title to the easement reverted to such succes
 
 *231
 
 sors; that the successors were not estopped to claim the railroad’s abandonment; that they have not waived the claim; that they have not been guilty of laches; and finally that the Buck decree of 1930 did not estop them from claiming title by reason of the abandonment subsequent to that date and that, indeed, since 1921 the railroad had made no effort to maintain or repair the improvements on the property.
 

 The appeal from this judgment, in substance, raises these chief issues: (1) whether the evidence properly sustains the finding that there has been an abandonment of the right of way for railroad purposes; (2) whether the servient owner must have relied upon that abandonment; (3) whether the court erred in refusing to permit the introduction of certain financial records; (4) whether respondents were barred from asserting such abandonment by waiver, estoppel or laches; and (5) whether the evidence was sufficient to support the finding of reversion or right of reentry.
 

 The first issue of abandonment, in turn, breaks into the following factors: the law of this case as to abandonment, the facts as to abandonment including the question as to whether the abandonment was voluntary, the alleged error of the trial court in accepting evidence of abandonment prior to the Buck decree, and the status of the 70-foot easements.
 

 The law of this case as determined by
 
 Ocean Shore Railroad Co.
 
 v.
 
 Doelger, supra
 
 (1954), 127 Cal.App.2d 392, 402, establishes that the railroad’s right of way consists of nothing more than an easement for railroad purposes, which is subject to extinction by abandonment. A railroad abandons its right of way when it couples nonuse with an intent to abandon.
 
 (People
 
 v.
 
 Southern Pacific Co.
 
 (1916), 172 Cal. 692, 700 [158 P. 177];
 
 Stannard
 
 v.
 
 Aurora, E. & C. Ry. Co.
 
 (1905), 220 Ill. 469 [77 N.E. 254, 255];
 
 Jones
 
 v.
 
 Van
 
 
 *232
 

 Bochove
 
 (1894), 103 Mich. 98 [61 N.W. 342, 343].) The intent to abandon congeals into the relinquishment of the purpose for which the easement has been conveyed, and this renunciation works a termination of the easement.
 
 (People
 
 v.
 
 Ocean Shore Railroad
 
 (1948), 32 Cal.2d 406, 418 [196 P.2d 570, 6 A.L.R.2d 1179];
 
 Slater
 
 v.
 
 Shell Oil Co.
 
 (1940), 39 Cal.App.2d-535, 549-550 [103 P.2d 1043];
 
 State
 
 v.
 
 Jacob
 
 (1953), (Mo.), 260 S.W.2d 22, 24.) Nor will a desire to utilize the property for other purposes prevent such extinguishment.
 
 (Chicago & N.W. Ry. Co.
 
 v.
 
 Sioux City Stockyards Co.
 
 (1916), 176 Iowa 659 [158 N.W. 769].) While nonuse alone does not establish the requisite intent, the court may consider the length of the nonuse in ascertaining the existence of such intent.
 
 {People
 
 v.
 
 Ocean Shore Railroad, supra
 
 (1948), 32 Cal.2d 406, 419;
 
 Gurdon & Ft. S. R. Co.
 
 v.
 
 Vaught
 
 (1911), 97 Ark. 234 [133 S.W. 1019, 1021].) And deterioration of, or failure to repair, an easement gives indication of abandonment.
 
 {Flanagan
 
 v.
 
 San Marcos Silk Co.
 
 (1951), 106 Cal.App.2d 458, 464 [235 P.2d 107].)
 

 When we turn to the factual showing of abandonment we find that the record amply sustains Judge Dematteis’ finding. The skeletal remains of the railroad, strewn from San Francisco to Santa Cruz, gives mute testimony of abandonment. Landslides, washouts, rotted trestles and a collapsed tunnel lie upon its long unused roadbed. The trains had not run for the 29 years that preceded the filing of the first pleadings and not for the 35 years that preceded the retrial.
 

 The very economic exigencies of today, as shown in the testimony, belie the professed intent not to abandon. Truck and ear competition caused the financial difficulties of the railroad in 1920, and since that time such competition has sharpened, not decreased. We are asked to believe that this railroad intends to challenge these more facile techniques of modern transport when, since 1920, other railroads, located in fertile valleys, not along narrow strips of coastline, have succumbed to them. While the railroad argues that “economic . . . infeasibility . . . has never been considered an element upon which to predicate ... an intent ... to abandon the right” it inconsistently affirms such feasibility and complains when the trial court does not accept its farflung hypotheses. Surely the trial court had every right to test the alleged intent against the external realities of commercial competition.
 

 
 *233
 
 Even to enter the field, the railroad would require for its reconstruction alone, without the acquisition of a single piece of rolling stock, a sum of more than five million dollars. Adam Smith’s “Wealth of Nations” rests upon the concept that reasonable men compete in the market place; the court could not assume that unreasonable men, bereft of the profit-making motive, would run this railroad.
 
 [2]
 

 The railroad strenuously contends that it is about to rehabilitate itself; yet it has voluntarily conveyed away great slices of its right of way without securing new easements, so that its proposed route is both vague and vacillating. It has in fact publicly asserted that it is not currently engaged in any other business than that incidental to liquidation, and its letter of April 20, 1950, to Doelger corroborates this position. Its spasmodic and abortive efforts at repair, fortuitously undertaken in the wake of condemnation proceedings, do not prove a bona fide intent to rehabilitate.
 

 While the railroad argues that abandonment must be voluntary, and that the Spring Valley condemnation litigation forced an involuntary cessation of its construction work, the record affords numerous indicia of voluntary relinquishment of the
 
 railroad purpose.
 
 Thus the railroad represented to the Corporation Commission that it did not intend to engage in any business and was liquidating itself; it proposed to sell to Doelger for building lot purposes the land upon which lay its right of way; it conveyed portions of its right of way to others; it failed to utilize prescriptive easements and thereby lost them; it allowed Lake Merced Golf and Country Club to erect upon the right of way a permanent structure, which stood there for eight years prior to the retrial of this case. Indeed, the record fully substantiates the trial judge’s conclusion that '‘[t] he continuous and tenacious efforts of the plaintiff [appellant herein] to preserve its interest in the remaining portion of the original right of way obviously are for purposes other than the operation of a railroad.”
 

 The railroad’s claim that its statement of intent not to abandon is the best evidence upon that issue fails to recognize the effect of its own citation of
 
 McMillan
 
 v.
 
 Warner
 
 (1873), 38 Tex. 411; the court there considered a party’s statement as
 
 *234
 
 decisive
 
 “if
 
 credible.” (Emphasis added; p. 415.) Moreover, whether appellant possessed the requisite intent is to be determined from the facts and circumstances of the case.
 
 (Willson
 
 v.
 
 Cleaveland
 
 (1866), 30 Cal. 192, 202.)
 

 We proceed to consideration of the railroad’s charge of error in the trial court’s acceptance of evidence relating to matters prior to the Buck decree. The railroad presses the argument that proof of its intent must be bifurcated. What happened prior to the decision of the Supreme Court upon the Buck decree in
 
 Ocean Shore R. R. Co.
 
 v.
 
 Spring Valley Water Go.
 
 (1933), 218 Cal. 86 [21 P.2d 588], which the railroad states became “final” on June 27, 1933, must be broken away from anything that occurred after it. But the operative force of the intent, if any, may be shown by its history. The trial court examined the totality of facts and circumstances, not to disprove the findings in the previous ease, but to test the
 
 present
 
 force and validity of the intent in the light of its previous history.
 
 (Bessler
 
 v.
 
 Powder River Gold Dredging Co.
 
 (1918), 90 Ore. 663 [176 P. 791], sustained on rehearing 178 P. 237.)
 

 A further flaw in the railroad’s contention in this regard lies in the date which it has selected as determinative. As we have said, it fixes the date as of June 27, 1933. Since the events that occurred between the trial in Judge Buck’s court in 1930 and the affirmance by the Supreme Court in 1933 could not possibly have been litigated in the trial court, the year of 1933 could not be the appropriate date for determining the facts upon which the Buck decree rests. In any event we need not resolve the problem; the prior appeal in this case treats 1930 as the determinative date.
 
 (Ocean Shore Railroad Co.
 
 v.
 
 Doelger, supra
 
 (1954), 127 Cal.App.2d 392, 402.)
 

 If, as we believe, the evidence supports the abandonment of the right of way for railroad purposes, this showing likewise disposes of the status of the 70-foot easements on either side of the right of way. By its own allegations the railroad acquired these 70-foot areas by prescription, utilizing them to support the right of way. The record indicates that the railroad used the 70-foot parcels only for the benefit of the dominant tenement, the right of way. In the light of the rule that “when the language of a deed is ambiguous, and it does not clearly appear whether the easement was intended to be in gross or appurtenant to land, it is never construed as personal when it may fairly be construed as appurtenant to
 
 *235
 
 some other estate”
 
 (Elliott
 
 v.
 
 McCombs
 
 (1941), 17 Cal.2d 23, 29 [109 P.2d 329];
 
 Balestra
 
 v.
 
 Button
 
 (1942), 54 Cal.App.2d 192, 198 [128 P.2d 816]), and in the absence of any evidence that these easements were ever devoted to any other purpose, the 70-foot easement must be deemed, as a matter of law, appurtenant to the right of way. Since an appurtenant tenement cannot exist separately from the dominant tenement
 
 (McClintic-Marshall Co.
 
 v.
 
 Ford Motor Co.
 
 (1931), 254 Mich. 305 [236 N.W. 792, 795-796];
 
 Cadwalader
 
 v.
 
 Bailey
 
 (1891), 17 RI. 495 [23 A. 20, 21]), the termination by abandonment of the dominant estate in the instant case also terminated the appurtenant 70-foot easement.
 

 The railroad’s further contention that its right of way could be saved by its claimed purpose to operate as a private railroad rather than as a public utility fails in the face of the findings of the trial court. Proof of abandonment, which amply sustains the court’s finding, applies with equal force to the private as well as the public operation. The railroad fails to make a case upon this attenuated argument; the mass of the evidence, upon which the findings are based, simply does not support it.
 

 In summary, we do not believe these legalistic protestations breathe operational life into the abandoned right of way or give vitality to the unused facilities. The physical showing of abandonment cannot be overcome by courtroom declarations of unexercised intent. The grass grows on this “right of way”; indeed, it is not only grass that intrudes upon it, but fences, highways, clubhouses, and lumber yards built by a growing community. Here this aged utility would stretch out its long and extended fingers of an alleged “right of way” to seize and remove the proof of its own decay.
 

 As we have stated, the railroad raises as a second principal point, that to effect an abandonment of the easement in this case the servient owner must have incurred expenses in reliance upon that abandonment and that the evidence here fails to show such reliance. While
 
 Smith
 
 v.
 
 Worn
 
 (1892), 93 Cal. 206 [28 P. 944], alludes to the necessity of reliance, quoting from Tiedeman on Real Property (1884), its comment comprises nothing more than dicta since the court expressly declares the dominant owner there did not intend to abandon the property. (P. 213.)
 

 Moreover, the triple requirement of
 
 Smith
 
 v.
 
 Worn, supra,
 
 93 Cal. 206, of nonuser and intent, plus reliance, has been superseded by the dual test of nonuser and intent. In
 
 *236
 

 People
 
 v.
 
 Southern Pacific Co.
 
 (1916), 172 Cal. 692, 700 [158 P. 177], the Supreme Court stated, “ ‘As a general rule, in order to constitute an abandonment of an easement in a right of way by a railroad company there must be a nonuser accompanied by unequivocal and decisive acts on the part of the company, clearly showing .an intention to abandon. . . .’ ” (See also
 
 Home Real Estate Co.
 
 v.
 
 Los Angeles Pac. Co.
 
 (1912), 163 Cal. 710, 714 [126 P. 972];
 
 Parker
 
 v.
 
 Swett
 
 (1919), 40 Cal.App. 68, 74 [180 P. 351];
 
 Watson
 
 v.
 
 Heger
 
 (1941), 48 Cal.App.2d 417, 420-421 [127 P.2d 153];
 
 Whelan
 
 v.
 
 Zahniser
 
 (1949), 92 Cal.App .2d 770, 775 [207 P.2d 629]; 17A Am. Jur., § 172, p. 779.) None of these cases imposes the railroad’s third requirement of reliance by the servient owner to his detriment.
 

 We turn to the third major point mentioned above, which the railroad presents: the court erred in refusing to permit the introduction of certain financial records to prove it had expended funds upon rehabilitation. While section 1953f of the Code of Civil Procedure permits the introduction of business records as an exception to the hearsay rule, the record will still be admissible only if relevant.
 
 Shehtanian
 
 v.
 
 Kenny
 
 (1958), 156 Cal.App.2d 576, 581 [319 P.2d 699]. The court noted that in Exhibit 31-C ‘ ‘ [t] here is no showing that it was moneys expended on behalf of the Ocean Shore Eailroad Company or for what purpose they were expended. ’ ’ Accordingly the court properly excluded the exhibit.
 

 Section 1953f provides that “[a] record . . . shall . . . be competent evidence ... if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.” Assuming the railroad’s Mr. Langert to have been a qualified witness, the record reveals that he was unable to lay the requisite foundation for the admission of Exhibits 31-A and 31-B. He testified that Exhibit 31-A was the general ledger, having been posted from Exhibits 31-B and 31-C, but then stated, “I can’t testify as to how [Exhibit 31-B] . . . was made.” Since the witness did not establish the mode of preparing Exhibit 31-B the court properly excluded the exhibit and its derivative 31-A.
 

 We next consider the fourth point proffered by appellant: whether Doelger was barred from asserting abandonment by reason of waiver, estoppel or laches.
 

 As to estoppel and laches, the railroad predicates this claim upon the inaction of Spring Valley, Doelger’s predecessor, during the time the railroad allegedly spent huge
 
 *237
 
 sums on “rehabilitation.” We have pointed out
 
 supra
 
 that the evidence sustains the trial judge’s findings as to the alleged “rehabilitation,” and the railroad cannot successfully rest the estoppel upon such alleged activities. Nor can the railroad found an estoppel upon failure of Spring Valley or Doelger to intervene in the numerous condemnation actions brought against Ocean Shore during this period. Spring Valley did make a claim of abandonment as early as 1922, which resulted in litigation that did not terminate until 1933. Doelger, too, claimed abandonment by the railroad in 1950 and this contention resulted in the problem now before this court in 1960. Thus the action of the parties sustains the trial court’s finding that they were not barred by estoppel or failure to press their positions. Furthermore, the railroad has not been damaged by any asserted delay of the claim of abandonment. See
 
 Allen
 
 v.
 
 California Mutual Bldg. & Loan Assn.
 
 (1943), 22 Cal.2d 474, 488 [139 P.2d 321] [laches];
 
 Erde
 
 v.
 
 City of Los Angeles
 
 (1955), 137 Cal.App.2d 175, 179 [289 P.2d 884] [estoppel].
 

 As to the waiver, the record affords no clear, unequivocal and decisive evidence of a purpose on the part of Spring Valley or any of the respondents to waive a legal right.
 
 (First Nat. Bank of Los Angeles
 
 v.
 
 Maxwell
 
 (1899), 123 Cal. 360, 368 [55 P. 980, 69 Am.St.Rep. 64].) Spring Valley’s delay in commencing a second action cannot be held to be a clear and decisive act which constitutes waiver; the utilization of appellant’s right of way in 1947 by Doelger, and the three-year delay in asserting abandonment, do not indicate waiver, especially in view of the railroad’s own evidence that during this period it was attempting to cooperate with Doelger. Any evidence of waiver is doubtful at best, and doubtful eases are to be resolved against a waiver.
 
 {Verdier
 
 v.
 
 Verdier
 
 (1955), 133 Cal.App.2d 325, 332 [284 P.2d 94].)
 

 The railroad’s fifth point, as we have noted, rests upon the contention that the evidence did not sufficiently support the finding of reversion of right of reentry.
 

 WTdle the railroad admits that the deed from Spring Valley to the “Doelgers personally specifically conveys all, remainders, reversions and rights of reentry,” the railroad argues that the “other deeds, from the Doelgers to Henry Doelger Builder, Incorporated, and from Doelger, Inc. to the Interveners, ... do not purport to convey any remainders, reversions or rights of reentry [and t]hat this omission is
 
 *238
 
 fatal to the cross-complaint and to the complaints in intervention. ...” Two answers defeat the contention: First, since the deeds from the Doelgers to Doelger, Inc., and from the latter to the interveners are not before this court, we must assume, in the absence of a contrary showing, that the trial court correctly decided the issue.
 
 (Campbell
 
 v.
 
 Walls
 
 (1888), 77 Cal. 250, 253 [19 P. 427].) Second, both Henry and Thelma Doelger are parties to this action; and, assuming such conveyance necessary, the failure of the deeds to convey such interest to the other respondents would constitute error which is prejudicial to them only; yet they make no claim of error.
 

 The court found that the railroad’s breach of condition (c) of the 1909 deed, consisting of its failure to erect a crossing demanded over the right of way, to be a basis for reversion. The railroad attempts a triple answer. It first contends that its obligation was limited to payment of extra expenses, such as those for safety devices, required by a railroad crossing. The literal wording of the deed, however, shatters the contention: the “ [r] ailway shall construct and maintain, at its own expense, any and all crossing over said surface rights of way that [Doelger] . . . may now, or at any time . . . require in its utilization of subdivision of its properties. . . .”
 

 The railroad secondly contends that the absence of railroad tracks signifies a changed condition from that contemplated by the deed and projects condition (c) into a state of suspended animation. But this argument cannot withstand the force of the injunctions procured by the railroad itself which prevented Doelger from crossing the right of way. Indeed the railroad’s contention in its closing brief that its injunctions only restrained Doelger’s heavy equipment from operating on the right of way constitutes in itself an admission that the railroad did not furnish the described crossings.
 

 Thirdly, the railroad falls back upon the argument that in any event the condemnation of such crossing areas by Daly City excused its failure to meet Doelger’s demands. But the trial court could properly infer that Doelger’s petition for condemnation and the city’s action followed the railroad’s refusal of performance; the railroad submits no citations in its voluminous brief, and we have found none in the transcript, to show that such condemnation did precede Doelger’s demand. Moreover, although the crossings were to be erected at the railroad’s expense, Doelger, as the sole assessee, became liable for the costs incurred by the city.
 

 
 *239
 
 We have attempted to discuss the main issues involved in this appeal; a review of every minor point would protract this opinion beyond reasonable length. We find no merit in the remaining contentions of the railroad.
 
 [3]
 
 We must terminate its long journey into history with the observation of Justice Murray Draper who, at the first trial of this case, said that “for more than 30 years the whistle of the Ocean Shore Railroad has sounded only in the courtroom, that the road has long since employed counsel rather than enginemen, and that the volume of its pleadings and briefs bids fair to exceed the total of its earloadings even in its active period.”
 
 [4]
 
 We submit that the time has come for the sounding of the last whistle.
 

 We affirm the judgment.
 

 Bray, P. J., and Duniway, J., concurred.
 

 A petition for a rehearing was denied April 26, 1960, and appellant’s petition for a hearing by the Supreme Court was denied May 25, 1960. Dooling, J. pro tem.,
 
 *
 
 participated therein in place of Spence, J.
 

 [1]
 

 "The said grant of the surface right of way is made upon the following conditions, precedent, present and subsequent, upon which the validity and continuance of the said grant depend to wit: . . . b. The said rights of way are only surface rights of way and do not convey the fee to the land, which fee is excepted and reserved from this grant, and shall forever belong to and be subject and subordinate to any use, by the party of the first part [Spring Valley Water Go.], its successors and assigns, which shall not interfere with the said surface rights of way, and which fee may be so used by the said party of the first part above or below any of the structures of said Ocean Shore Bailway Company in the premises; e. The said Ocean Shore Bailway shall construct and maintain, at its own expense, any and all crossing over said surface rights of way that the party of the first part, its successors and assigns, may now, or at any time or times hereafter, require in its utilization of subdivision
 
 *231
 
 of its properties, and all such crossings, subject to the use of said surface rights of way for the purposes of the Railway Company are hereby reserved and excepted from the effect of this grant, and the said Ocean Shore Railway Company shall, at its own expense, construct and maintain perpetually, in good condition, any and all fences in the premises ... of such plan and material as the said party of the first part, its successors or assigns, may require from time to time in all the premises, for the present and until change is ordered by said party of the first part,—the same to be similar to the barbed wire fence now on the Rancho Laguna de la Merced, or approved American field fence; . . . i. Such rights of way shall also be subject and subordinate to all crossings and rights of way granted or agreed to be granted, or that may hereafter be granted by said party of the first part to any municipal authority for highway or public, or limited highway and public use.”
 

 [2]
 

 "The railroads are not run for the benefit of the dear public. . . . They are built for men who invest their money and expect to get a fair percentage on the same.” W. H. Vanderbilt: To two newspaper reporters aboard his special train approaching Chicago, Oct. 8, 1882. (Chicago Daily News, Oct. 9, 1882.)
 

 [3]
 

 The railroad raises for the first time in its closing brief that it is without legal capacity to form the requisite intent to abandon, and that Findings 42 and 46 are conflicting and irreconcilable and that it has been denied certain alleged constitutional rights. Since the railroad offers no excuse for its failure to include such issues in its 239-page opening brief, we do not pass upon them at this juncture.
 
 (Kahn
 
 v.
 
 Wilson
 
 (1898), 120 Cal. 643, 644 [53 P. 24];
 
 Monk
 
 v.
 
 Ehret
 
 (1923), 192 Cal. 186, 190 [219 P. 452];
 
 Cooper
 
 v.
 
 National Motor Bearing Co.
 
 (1955), 136 Cal.App.2d 229, 238 [288 P.2d 581, 51 A.L.R.2d 963];
 
 Faus
 
 v.
 
 Pacific Electric Ry. Co.
 
 (1956), 146 Cal.App.2d 370, 379 [303 P.2d 814].)
 

 [4]
 

 Clerk’s Transcript, Appeal from the Judgment, Decree and Order for Permanent Injunction made in the Superior Court of San Mateo County on January 15, 1952, Civil No. 52048, pp. 66-67.
 

 *
 

 Assigned by Chairman of Judicial Council.