[Civ. No. 54319. Second Dist., Div. Four. Dec. 3, 1979.]

BRICKE JOY FRAIJO, a Minor, etc., et al.,
Plaintiffs and Appellants, v.
HARTLAND HOSPITAL et al., Defendants and Respondents.

Counsel

Lintz, Williams & Rothberg, Sayble & Raphael and Leonard Sacks for Plaintiffs and Appellants.

Grace, Neumeyer & Otto, John Carpenter Otto, Richard A. Neumeyer, Brian D. Eyres, Hillsinger & Costanzo and Darrel A. Forgey for Defendants and Respondents.

Opinion

**JEFFERSON (Bernard), J.**—This is an action for medical malpractice. Plaintiffs Bricke Joy Fraijo, a minor, by her guardian ad litem Dale

Boyd, Brande Lynn Leinart, Brad O'Neil Leinart, and Dale Boyd, as the surviving relatives of decedent, Annette Boyd, sought damages for the latter's wrongful death.[1] Named as defendants were Hartland Hospital, a California corporation,[2] Thomas Koumas, M.D., Raymond Henry, M.D., and Jiing Chen, R.N. Trial was by jury. The jury's verdict was in favor of all four defendants. Plaintiffs sought a new trial, but the motion was denied. Plaintiffs now appeal from the judgment, which we affirm.[3]

Plaintiffs do not attack the sufficiency of the evidence to support the judgment, but assert primarily that serious errors were made by the trial court in jury instructions and in an evidentiary ruling. To clarify these contentions made on appeal, we summarize the evidence adduced below, mindful of the appropriate standard of appellate review, which compels us to view the evidence in the light most favorable to the defendants as the prevailing parties below.

I

*A Summary of the Evidence*

On June 13, 1973, Annette Boyd was 39 years of age, married to Dale Boyd and the mother of three children by previous marriages, Brad, Brande and Bricke. She was by occupation a cook, and was troubled with what apparently was a chronic condition of asthma.[4] Her regular physician, a Dr. Sanyal, had recommended that she undergo some testing at the General Hospital in Los Angeles, and had made an appointment for her there. However, in the week prior to June 13, Mrs. Boyd had twice visited the emergency room at the Baldwin Park Community Hospital, because she was experiencing difficulty in breathing. On these occasions, she had received medication and had received assistance with breathing from an inhalation machine known as an IPPB device. She had been sent home with instructions to contact her regular doctor, but for some reason did not do this.

---

[1] The complaint included a second cause of action for negligent infliction of emotional distress upon Dale Boyd, but that cause was dismissed by the trial court.

[2] Hartland Hospital is now known as the Baldwin Park Community Hospital, and will be referred to by its present name in our discussion.

[3] Plaintiffs have dismissed the appeal as to defendant Thomas Koumas, M.D., only.

[4] A condition described at trial as "spasms of shortness of breath due to narrowing of the lumens of the bronchi and bronchioli." The medical history given by Mrs. Boyd to defendant, Dr. Koumas, indicated that she had been having asthma attacks for six years.

At approximately 8 p.m., on the evening of June 13, 1973, Mrs. Boyd again came to the emergency room of defendant hospital, where she was attended by hospital employee, Dr. Raymond Henry. Dr. Henry testified that, when he saw the decedent, she was in moderate respiratory distress, but examination did not reveal any condition suggesting mortal danger. However, Dr. Henry concluded that Mrs. Boyd should be admitted to the hospital because she had had several recent asthma attacks and needed the ongoing treatment available to her as a hospital patient. During the two hours Mrs. Boyd was in the emergency room, Dr. Henry ordered what was standard treatment for asthmatics, i.e., dextrose and water to prevent dehydration, aminophyline and bronkosol to dilate the lungs and assist breathing, and an IPPB treatment, also to assist breathing. These procedures were carried out in the emergency room.

Dr. Henry did not have the authority to admit the patient to the hospital, but consulted with Dr. Thomas Koumas, a physician who on that date was on the "backup panel" at the hospital, a panel composed of physicians who volunteered to take charge of the care of patients who needed hospitalization but had no available physician of their own choice. Dr. Koumas examined Mrs. Boyd, took her medical history, and agreed that hospitalization was needed. A tranquilizer, Vistaril, was given Mrs. Boyd before she left the emergency room; it is used primarily to relieve the understandable anxiety experienced by asthmatics when they cannot breathe easily. Mrs. Boyd was observed to be very anxious.

By 10 p.m. Mrs. Boyd was admitted to a ward, at which time she seemed to be responding slightly to the treatment already given. Dr. Koumas had made an overall plan for her care, including a complete laboratory workup. While he had cared for asthmatics, it was his intention to consult with a specialist in asthma after the results of the lab work had become available. Dr. Koumas had written 16 orders as part of his overall plan. These instructions to the nursing and hospital staff included the giving of a steroid to assist breathing, oxygen as needed, a chest X-ray, an electrocardiagram, and various laboratory tests.

Dr. Koumas had also given the following instruction for the patient: "Demerol 75, plus Phenergan 25 mg q 4h P.R.N. for pain." This was medical shorthand for the giving of 75 milligrams of Demerol and 25 milligrams of Phenergan "as needed" for pain every four hours. Demerol, it developed at trial, is a narcotic, frequently used to combat

pain; it is meperidine hydrochloride, manufactured by Winthrop Laboratories. The Phenergan is given with Demerol to facilitate the latter's effectiveness. The literature provided with Demerol by the manufacturer included, in 1972, a warning that "Meperidine should be used with extreme caution in patients having an acute asthmatic attack,...[i]n such patients, even usual therapeutic dosages of narcotics may decrease respiratory drive while simultaneously increasing airway resistance to the point of apnea." Apnea is cessation of breathing. The warning of the manufacturer went on to refer to the possibility of cardiac arrest as a potential danger. An antidote for Demerol is Narcan or Nalline.[5]

According to Dr. Koumas' testimony, he had looked in on Mrs. Boyd in her hospital room at about 10:15 p.m., and had written two additional orders at that time. He had again ordered the steroid, Solu-Cortef, because it had not yet been given; he also directed that blood gas studies be undertaken to determine the amount of carbon dioxide in Mrs. Boyd's blood. Dr. Koumas testified that, when he saw Mrs. Boyd on this occasion, she was still having dyspnea, i.e., breathing difficulty, but was not in peril. Dr. Koumas then left the hospital.

The nurse in charge of Mrs. Boyd's ward that evening was Dorothy Wilson, a registered nurse. Ms. Wilson had been a nurse for many years and had experience caring for asthmatics. From 10 p.m. on, she devoted much of her time to seeing that Dr. Koumas' orders were carried out. Ms. Wilson testified that she had not personally seen any physician in the patient's room between 10 p.m. and 11 p.m., but that she had called Dr. Koumas on the telephone shortly after 10 p.m. to inform him that Mrs. Boyd was experiencing an increased pulse and respiration rate. According to Nurse Wilson, Dr. Koumas had then ordered the steroid, which would take some time before it would be effective, and had asked her to let him know later how Mrs. Boyd was reacting.

Ms. Wilson testified that, during that hour, from 10 to 11 p.m., Mrs. Boyd was given an IPPB treatment, an electrocardiagram was attempted, a portable X-ray taken, and the steroid was started, as per instructions. However, at 10:50 p.m. the patient underwent a substan-

---

[5]None of the doctors involved in this case, including the experts, disputed that Demerol did inhibit respiration, although apparently it is still used with asthmatics to combat pain. Both Dr. Henry and Dr. Koumas testified that, given the *severity* of an asthmatic attack in a particular case, the administration of Demerol would be contraindicated.

tial change for the worse; her pulse and respiration rates increased, as did her blood pressure; she was anxious and had increased difficulty breathing. Ms. Wilson stated that she did not call Dr. Koumas upon noting this change of conditions, because she was too busy caring for the patient.

At 11:05 p.m., after Mrs. Boyd had complained of chest pain, Nurse Wilson decided to give the Demerol, as prescribed by Dr. Koumas. Ms. Wilson testified that, noting that the patient had been given Vistaril earlier in the evening, she called Dr. Henry in the emergency room to ask him if the Vistaril had been effective; he replied that it had had only limited effect. It appears that Dr. Henry was not told by Nurse Wilson of Mrs. Boyd's change of condition. Nurse Wilson then directed the medication nurse, Jiing Chen, to give Mrs. Boyd the shot of Demerol. Nurse Chen's deposition was read to the jury; she testified that she had given the shot "IM.,' i.e., intramuscularly.[6]

Shortly after the Demerol had been given, Ms. Wilson checked Mrs. Boyd and noted that she was cyanotic, with lips and fingers turning blue. She immediately called for the inhalation specialist, Fazio, to come and start the breathing machine. At 11:10 p.m., while the equipment was being started, Mrs. Boyd convulsed and stopped breathing. Nurse Wilson signalled "Code Blue," which indicated a cardiac arrest was taking place; Dr. Henry arrived at 11:15 p.m. He entubated Mrs. Boyd to create an airway to the lungs. He testified that when he arrived, Mrs. Boyd was in cardiopulmonary arrest, which meant that not only had her respiration ceased, but her heart had stopped beating. Intense and continuous efforts were made by Dr. Henry, Dr. Koumas (who arrived later) and other hospital personnel to rescuscitate Mrs. Boyd, but the efforts were unsuccessful. Mrs. Boyd was declared dead at 12:15 a.m.

No autopsy was performed on Mrs. Boyd for reasons that are not clarified by the record. Both Dr. Koumas and Dr. Henry were unsure as to the cause of death. Dr. Koumas testified at trial that he had refused to sign the death certificate because he did not understand why the pa-

---

[6]Nurse Chen also testified that she was aware that Demerol had a somewhat depressing effect upon respiration, but that it was effective in relieving pain. She said that, before she gave the shot, she spoke to Dr. Henry about giving it because Mrs. Boyd was having so much difficulty breathing; she said Dr. Henry told her to go ahead and give it. Dr. Henry denied that he had spoken to either Nurse Wilson or Nurse Chen about Mrs. Boyd's condition, or that he had assured Chen it was all right to give the shot.

tient had died. There was subsequently an investigation and a report by the Los Angeles County Coroner's office, which merely concluded that the cause of death was heart and lung failure, without making a definitive determination as to the basic cause of the failure. There was no evidence presented that Mrs. Boyd's husband or children had objected to an autopsy.

The cause of death became a primary issue at trial. Plaintiffs' theory, presented to the jury through the expert testimony of Anton Naujokaitis, M.D., was that the care of the patient from her arrival at the emergency room until her death was substandard from a medical point of view, considering the seriousness of her asthmatic condition; that the care was "too little, too late" and that the administration of Demerol, with its slowing effect on respiration, constituted the final incident of substandard medical practice which resulted in Mrs. Boyd's death.

The two medical experts for the defense disputed this theory. Dr. Wilbur Hallette was a specialist in internal medicine; he was presently the medical director of respiratory therapy and pulmonary function testing at Verdugo Hills Hospital; he was formerly chairman of the department of pulmonary diseases at the City of Hope Medical Center in Duarte. He testified that, in his opinion, the care given Mrs. Boyd both at the emergency room and in the hospital was adequate. He doubted that the shot of Demerol had contributed to Mrs. Boyd's death. Noting that it had been given intramuscularly at 11:05 p.m., he explained that a shot given in a muscle does not affect the patient as soon as one given in the vein, and that it was unlikely that it caused the convulsion and apnea which occurred only five minutes later.

Dr. Hallette concluded that other causes of death were far more likely than plaintiffs' theory. He suggested the possibility of a pulmonary embolism, a myocardial infarction, or a spontaneoupneumothorax (collapse of a lung) as the cause of death. However, he could not rule out an unusual, hypersensitive reaction to Demerol or an acute asthmatic attack which proved irreversible.

The other defense expert, Dr. Joseph Boyle, was also an internist, with a subspecialty in diseases of the chest. He had practiced at Good Samaritan Medical Center in Los Angeles and, at time of trial, was an associate clinical professor of medicine at the University of Southern California Medical School. Reviewing the plan of treatment for Mrs. Boyd, from the emergency room on, including the giving of Demerol for

pain, Dr. Boyle stated that it met the requisite standard of medical care in the community.

Dr. Boyle also testified concerning the nursing care. He found nothing substandard about Nurse Wilson's failure to call Dr. Koumas at 10:50 p.m., even though there had been a substantial change in Mrs. Boyd's condition; he explained that it would not have been unusual for Mrs. Boyd's condition to stabilize in a short time. He declined to characterize the exercise of discretion by Nurse Wilson in giving the Demerol as substandard practice for the nursing profession.

Dr. Boyle was of the opinion that Mrs. Boyd died as the result of an idiosyncratic reaction to the shot of Demerol. He explained that an idiosyncratic reaction refers to a "sensitivity peculiar to that individual." Other causes of death, such as pulmonary embolism or myocardial infarction, could not be ruled out, but Dr. Boyle could find no evidence that indicated that either had occurred. Nor did Dr. Boyle think that Mrs. Boyd had succumbed to acute asthma because, ordinarily, an individual in peril due to asthma would have responded favorably to the emergency measures employed by Dr. Henry and others after 11:15 p.m. Dr. Boyle thought it significant that at no time after the convulsion did Mrs. Boyd ever respond with either renewed lung or heart activity.

With this summary of the evidence, we turn to a consideration of the contentions made on this appeal.

## II

### The Instructions Given Regarding the Standard of Care of Nurses

The trial court gave to the jury the standard instruction on "Duty of a Nurse," BAJI No. 6.25.[7] In addition, it gave two instructions ordinarily applicable to physicians and surgeons, tailoring the instructions by adding "or nurse" to them. These instructions were BAJI No. 6.02

---

[7]That instruction reads as follows: "It is the duty of one who undertakes to perform the service of a trained or graduate nurse to have the knowledge and skill ordinarily possessed, and to exercise the care and skill used in like cases, by trained and skilled members of the nursing profession practicing their profession in the same or a similar locality and under similar circumstances. Failure to fulfill either of those duties is negligence."

on "Medical Perfection Not Required" and BAJI No. 6.03 concerning "Alternative Methods of Diagnosis or Treatment."[8]

Plaintiffs do not challenge the giving of BAJI No. 6.25 (see fn. 7), which instructed the jury to assess the nurses' conduct by using a *professional* standard of care rather than the general standard of reasonableness employed in cases involving ordinary negligence. The adequacy of a nurse's performance is tested with reference to the performance of other *nurses*, just as is the case with doctors.

However, plaintiffs do attack the extension of a nurse's professionalism into the area of independent judgment, by the instructions given the jury relating to a nurse's errors in judgment and a nurse's selection of alternative measures where there are alternative methods of treatment. Plaintiffs claim that there is no authority known to them that approves the use of these two instructions, for nurses as opposed to doctors. Plaintiffs also appear to argue that nurses should not be held to the standard of care applicable to the medical profession; we fail to perceive how such an argument assists plaintiffs here.

Research reveals very little California law discussing in depth the nature and extent of a nurse's liability to a patient. Some early cases focused on general principles of negligence rather than a professional standard (e.g., *Griffin* v. *County of Colusa* (1941) 44 Cal.App.2d 915 [113 P.2d 270]).

Other California cases, however, have applied a professional standard for nurses in malpractice cases. (*Williams* v. *Pomona Valley Hosp.*

---

[8]BAJI No. 6.02, as modified and given, reads as follows: "A physician or nurse is not negligent simply because their efforts prove unsuccessful. It is possible for a physician or nurse to err in judgment, or to be unsuccessful in their treatment without being negligent. [¶] However, if a physician or nurse does not possess that degree of learning and skill ordinarily possessed by physicians and nurses of good standing practicing in the same or a similar locality and under similar circumstances, or if they fail to exercise the care ordinarily exercised by reputable members of their professions in the same or a similar locality and under similar circumstances, it is no defense to a charge of negligence that they did the best they could and their efforts simply proved unsuccessful." (BAJI No. 6.02 has been shortened considerably in the 1977 Revision (see Cal.Jury Instns., Civ. (6th ed.)), but in essence remains the same.)

BAJI No. 6.03, as modified and given, reads as follows: "Where there is more than one recognized method of diagnosis or treatment, and no one of them is used exclusively and uniformly by all practitioners of good standing, a physician or nurse is not negligent if, in exercising their best judgment, they select one of the approved methods, which later turns out to be a wrong selection, or one not favored by certain other practitioners."

*Assoc.* (1913) 21 Cal. App. 359 [131 P. 888]; *Valentin* v. *La Societe Francaise* (1946) 76 Cal.App.2d 1 [172 P.2d 359]; *Cooper* v. *National Motor Bearing Co.* (1955) 136 Cal.App.2d 229 [288 P.2d 581, 51 A.L.R.2d 963].) In the *Cooper* case, which involved the issue of malpractice of an industrial nurse, the court approved a jury instruction which conveyed the view (in different language) that "a nurse's diagnosis of a condition must meet the standard of learning, skill and care, to which nurses practicing that profession in the community are held." (*Id.* at p. 237.)

■ Today's nurses are held to strict professional standards of knowledge and performance, although there are still varying levels of competence relating to education and experience. In a comprehensive note (Eccard, *A Revolution in White - New Approaches in Treating Nurses as Professionals*) in 30 Vand.L.R. 839 (1977), the author presents a persuasive case for adjudging nurses by a professional standard of their own. Some difficulties are presented by the fact that a nurse's traditional role has involved "both routine, nontechnical tasks as well as specialized nursing tasks. If, in considering the case law in this area, the dispute is analyzed in terms of what action by the nurse is being complained about, it is possible to make some sense out of the relevant decisions. In addition, it is possible to use these precedents accurately in view of the current changes taking place in nursing." (P. 861.) The changes referred to reflect increasing emphasis on high standards for nurses; those with superior education and experience often exercise independent judgment as to the care of patients whether in a hospital setting or elsewhere. While nurses traditionally have followed the instructions of attendant physicians, doctors realistically have long relied on nurses to exercise independent judgment in many situations.

The question raised herein as the result of the trial court's modification of the two instructions relating to judgment and choice of treatment is how the reality of delegations of authority should be treated in the malpractice context. In the instant case, Nurse Wilson, a hospital employee, was not a named defendant. Another hospital employee, Jiing Chen, the medication nurse, was so named. ■ A nurse may, of course, be held liable for her own negligence (*Hallinan* v. *Prindle* (1936) 17 Cal.App.2d 656 [62 P.2d 1075]; see Annot. (1957) 51 A.L.R.2d 970) and her employer, the hospital, can be held responsible for the negligence of either employee nurse pursuant to the doctrine of respondeat superior (*Rice* v. *California Lutheran Hospital* (1945) 27 Cal.2d 296 [163 P.2d 860]). The controversial order to the nurses,

made by Dr. Koumas concerning the giving of Demerol, was phrased P.R.N. ("as needed"); the doctor was relying upon the nursing staff to observe the patient and make an independent judgment to give or not to give Demerol.

If standard medical practice permits physicians to confer upon nurses in certain medical situations the exercise of independent judgment, nurses in those situations must be accorded the potential benefits to be derived from BAJI Nos. 6.02 and 6.03. To hold otherwise would impose upon nurses a standard of care exceeding that applicable to the medical profession, hardly a fair result.

■ We note that plaintiffs have not alluded to any evidence in the record which suggests that, under the circumstances involved in the case before us, it was contrary to sound medical practice for a physician to delegate a discretionary exercise of judgment to nurses, or contrary to sound nursing practice for a nurse to accept such a delegation of discretionary exercise of judgment. In the absence of such evidence, we cannot hold that it was error for the trial court to give the modified versions of BAJI Nos. 6.02 and 6.03. We do not believe that these instructions were intended to confer upon nurses the exercise of discretion as if they possessed the same knowledge that physicians possess. Nor do we believe that the jury would so understand the instructions or consider that nurses were entitled to exercise a discretionary judgment other than in accordance with the best judgment of the nursing profession. We conclude, therefore, that, in the case at bench, the trial court appropriately tailored the instructions set forth *ante* to apply to nurses as well as to physicians.

■ Plaintiffs also challenge the giving of the "error in judgment" instruction (BAJI No. 6.02) in *any* medical malpractice case, whether involving doctors or others. It is claimed that this instruction provides too easy an "out" for malpractice defendants. BAJI No. 6.02, however, has been held to be a correct statement of law. (See *Rainer v. Community Memorial Hosp.* (1971) 18 Cal.App.3d 240, 260 [95 Cal.Rptr. 901].) It tells the jury that an error in medical judgment is not considered in a vacuum but must be weighed in terms of the professional standard of care.

Plaintiffs also assert that if it was proper for the trial court to modify BAJI No. 6.02 and BAJI No. 6.03 to include nurses, then BAJI No. 6.04 (Duty to Refer to Specialist) should have been similarly modified

to instruct the jury concerning a nurse's responsibility to seek assistance from more highly skilled medical personnel when a patient's condition alters substantially, as it did in the instant case before 11 p.m. BAJI No. 6.04 was given to the jury but only as it applied to doctors.

It is clear that the plaintiffs were entitled to instructions relating to any issue raised by the evidence. If the evidence established that the failure of a nurse to consult the attending physician under the circumstances presented in the case at bench was not in accord with the standard of care of the nursing profession, plaintiffs could have requested an instruction similar to BAJI No. 6.04. ■ The failure of the trial court to modify BAJI No. 6.04, or to develop its own instruction on this point, is no ground of error in the absence of a party's request for such an instruction.

## III

### *The Evidentiary Ruling With Respect to the Manufacturer's Brochure*

During the testimony of Nurse Wilson on direct examination, defense counsel elicited that she had given Demerol on other occasions to severely asthmatic patients. On cross-examination, plaintiffs' counsel produced a brochure which he asserted was prepared by the manufacturer of Demerol for inclusion in the drug's package, a brochure which contained warnings about Demerol's use when a patient was experiencing a respiratory problem such as asthma. Plaintiffs' counsel then asked the witness if she was familiar with such literature provided by the manufacturer and she replied that she was.

At this point plaintiffs' counsel sought to introduce the brochure into evidence. Defense counsel objected that no foundation had been laid for introduction, and, further, that the brochure itself was hearsay. A conference was held in chambers on the issue. The trial judge ruled that no proper foundation had been laid, and precluded plaintiffs' counsel from asking the witness if she had read the brochure. Later in the trial, during the cross-examination of Dr. Hallette, one of the defense medical experts, plaintiffs' counsel again sought introduction of the brochure, which was then admitted into evidence without objection by the defense. Nurse Wilson, however, was not recalled to the witness stand by the plaintiffs.

Plaintiffs claim that the ruling of the trial court in foreclosing cross-examination of the witness about whether she had read the brochure was error. We disagree. The brochure itself was not proffered by plaintiffs' counsel as hearsay evidence as defendants contended below; it was not offered for the truth of its contents, but was offered for the nonhearsay purpose to show knowledge of its contents on the part of the witness-nurse—a fact relevant to the characterization of the conduct of the nurse, with such knowledge, as being negligent or not. However, in order to establish relevancy of the document for this purpose, it was incumbent upon the plaintiffs to establish that the brochure produced in court had accompanied the product and been distributed thereby to the customers purchasing the product.

This foundation, known as *authentication*, was necessary in order for plaintiffs to obtain admissibility of the brochure for the nonhearsay purpose sought (Evid. Code, § 1401, subd. (a)) of cross-examining the witness about her knowledge of the contents of the document. Plaintiffs did not offer evidence of authentication before seeking to cross-examine the witness-nurse. As pointed out in *Meier v. Ross General Hospital* (1968) 69 Cal.2d 420, 432 [71 Cal.Rptr. 903, 445 P.2d 519], "the plaintiffs do not present an adequate record for challenging this ruling since they laid no foundation for admission of the brochure and presented no propery informative offer of proof." It is of no consequence that, at a later point in the trial, such a foundation was laid through questions put to Dr. Hallette. At the time the trial court made its ruling, which is the significant time, the record establishes that the ruling was correct.

## IV

### *Instructions on Proximate Cause*

As our evidentiary summary indicates, a crucial issue at trial concerned causation, the logical connection between the conduct of the defendants or any one of them and the death of Mrs. Boyd. The trial court gave two instructions on proximate cause—BAJI Nos. 3.75 and 3.77.

BAJI No. 3.75 provides as follows: "A proximate cause of an injury is a cause which, in natural and continuous sequence, produces the in-

jury, and without which the injury would not have occurred." BAJI No. 3.77 provides as follows: "There may be more than one proximate cause of an injury. When negligent conduct of two or more persons contributes concurrently as proximate causes of an injury, the conduct of each of said persons is a proximate cause of the injury regardless of the extent to which each contributes to the injury. A cause is concurrent if it was operative at the moment of injury and acted with another cause to produce the injury."

As the "Use Note" following BAJI No. 3.77 indicates, "this instruction should be given immediately following Instruction 3.75 or 3.76 whenever the issue of negligence of two or more defendants . . . is submitted to the jury."

The alternative instruction to BAJI No. 3.75 is BAJI No. 3.76, which provides: "A legal cause of an injury is a cause which is a substantial factor in bringing about the injury." ■ Plaintiffs contend that it was prejudicial error for the trial court to give BAJI No. 3.75—the "but for" proximate cause instruction—instead of BAJI No. 3.76 requested by plaintiffs.

BAJI instruction No. 3.76 is derived from the Restatement Second of Torts, section 431, which was a response to the substantial debate over "causation" and the criticism of the traditional reference to "proximate" cause in jury instructions. Such authoritative commentators as Prosser prefer the "substantial factor" language in BAJI No. 3.76 as probably the most intelligible definition of legal causation that can be fashioned for jury understanding. The word "proximate," it is felt, confuses juries by placing undue emphasis on "nearness." (See, generally, Prosser on Torts (4th ed. 1971) Proximate Cause, §§ 41-42, pp. 236-250.)

However, despite the criticism of the "but for" language in BAJI No. 3.75, the most recent edition of California Jury Instructions (Civil) (6th ed. 1977) still includes both instructions, allowing the trial judge to exercise a discretion in selecting his preference between the two instructions—the "proximate cause" instruction found in BAJI No. 3.75, or the "legal cause" instruction found in BAJI No. 3.76.

The only situation where it seems generally recognized that the "but for" proximate cause instruction is inapplicable is where it is claimed

that two independent causes have concurred to bring about an event, either of which operating alone would have been sufficient to cause the result. (*Thomsen* v. *Rexall Drug & Chemical Co.* (1965) 235 Cal.App.2d 775 [45 Cal.Rptr. 642].)

Plaintiffs contend that instructing the jury on "but for" causation was particularly inappropriate in the case at bench, where the cause of action was medical malpractice and various defendants were charged with negligent acts contributing to the death of Mrs. Boyd. But plaintiffs' evidence does not lend itself to a characterization of the alleged causes as independent in the sense intended in *Thomsen, supra.* We are compelled to conclude that, rather than being independent, the causes alleged were "concurrent." The latter word more aptly describes the conduct of two or more health providers working in common cause to care for a patient in a hospital setting. Since the trial judge did instruct on "concurrent" causes, we find that the instructions given were adequate.

Plaintiffs also claim that BAJI No. 3.75's description of the chain of causation as a "natural and continuous sequence" is confusing and misleading, particularly in a medical malpractice case such as the one at bench where it was difficult to show the sequence of events clearly. We agree that BAJI No. 3.75—the proximate cause instruction—is far from constituting a model of clarity in informing a jury as to what is meant by proximate causation. We believe that the "substantial factor" language found in BAJI No. 3.76 is preferable, as "[t]he phrase is sufficiently intelligible to any layman to furnish an adequate guide to the jury,. . ." (Prosser, *Proximate Cause in California* (1950) 38 Cal.L. Rev. 369, 379.) Nevertheless, in view of its long history of being considered a correct statement of the law by the courts of this state, we are not inclined to hold that BAJI No. 3.75 is an erroneous instruction. Although we believe such a determination should be made, we consider that the determination ought to be made by our Supreme Court and not by an intermediate reviewing court.

We point out that, in the case at bench, plaintiffs' cause of action rested upon the happening of an unusual and unexpected event, the sudden death of Mrs. Boyd. The members of the jury who returned the defense verdict may well have arrived at this result because the absence of an autopsy created an opportunity for the presentation of various nonpersuasive competing theories concerning the cause of death, and no

persuasive answer to this issue emerged from the evidence to sustain plaintiffs' burden of proof.

The judgment is affirmed.

Files, P. J., and Swearinger, J.,* concurred.

---

*Assigned by the Chairperson of the Judicial Council.