[No. H007709. Sixth Dist. Nov. 19, 1992.]

SHARON BROOKHOUSER an Incompetent Person, etc., Plaintiff and Respondent, v.
THE STATE OF CALIFORNIA et al., Defendants and Appellants.

**COUNSEL**

Daniel E. Lungren, Attorney General, Tyler B. Pon and Ronald V. Thunen, Deputy Attorneys General, for Defendants and Appellants.

Stephen F. Von Till and Michael D. Imfeld for Plaintiff and Respondent.

**OPINION**

**BAMATTRE-MANOUKIAN, J.**—Sharon Brookhouser, a mentally ill person, failed to return from a short leave from an unlocked board and care facility. Two days later she walked onto a highway and was struck and gravely injured by an automobile. Through a guardian ad litem she sued a number of defendants including the State of California and its employee,

social worker Ellen Mary Farr, who had been Brookhouser's assigned case manager at relevant times. As to all defendants other than Farr and the state, Brookhouser's claims have been either settled or resolved against her. The superior court denied Brookhouser relief, as against Santa Cruz County, from the California Tort Claims Act requirement of a timely claim; on appeal the First District Court of Appeal affirmed the denial. A first trial resulted in rulings and verdicts in favor of the remaining defendants; upon Brookhouser's second appeal the First Appellate District reversed the defense judgment as to certain of Brookhouser's theories of recovery. This third appeal follows a second trial, at which a jury returned special verdicts finding that Farr and the state had violated the Welfare and Institutions Code by failing to give the board and care facility operator information about Brookhouser's previous conduct relevant to suitability of her placement at the facility, that the violation was a legal cause of Brookhouser's injuries, and that Brookhouser had sustained damages of nearly $2.7 million. Judgment was entered against Farr and the state on the special verdicts, and they appeal. We shall conclude that the evidence was insufficient to establish that the failure to provide information caused Brookhouser's injuries, and that in any event Farr and the state were as a matter of law immune from liability to Brookhouser in the circumstances of record. We shall reverse the judgment, with directions to enter judgment for Farr and the state.

The evidence relevant to the questions the parties raise is clear and for the most part undisputed.

Brookhouser's first reported symptoms of mental illness occurred in 1973 when she was 33 years old. In 1974 she moved to her parents' home in Santa Cruz County, and later that year her father was appointed guardian of her estate.

In 1976, while hospitalized at Napa State Hospital, Brookhouser left the hospital on a pass and failed to return. Later in 1976 she was twice hospitalized in a locked neuropsychiatric ward in Santa Cruz County.

Early in 1977 Brookhouser tried to walk away from her parents' home. They arranged for her to be returned to the neuropsychiatric ward. The day after she was hospitalized she walked away from the neuropsychiatric ward. She was not seen again until, several months later, she was found in San Francisco and taken to Napa State Hospital under an incorrect name. When her true identity was learned, state responsibility for her care was transferred to the state's Santa Cruz Community Care Services Section where Farr was employed as a social worker.

In October 1977 the Santa Cruz County Superior Court found Brookhouser to be gravely disabled. The county's public guardian was appointed

conservator of her person and the court directed that Brookhouser be placed within the county. At this time the state assigned Farr to be Brookhouser's case manager.

On October 17, 1977, the public guardian, with Farr's concurrence, placed Brookhouser at Rose Acres, an unlocked board and care facility. One week later Brookhouser left Rose Acres to go to a day treatment program but did not return. On October 28 she was seen walking on a highway; police later found her sleeping under a tree in the rain. She was returned to the neuropsychiatric ward in a "bizarre and incoherent" state.

At the end of October Farr and the public guardian determined that Brookhouser should be placed in a locked facility. There is evidence that, although she had walked away from the neuropsychiatric ward and from at least one other locked facility, Brookhouser had never escaped from the locked portion of such a facility but that all of her "AWOL incidents" occurred "when, for some reason or another, she was unattended . . . in an insecure place." The public guardian attempted to place Brookhouser in a locked facility, Santa Cruz Care and Guidance Center, but the facility refused to accept Brookhouser because it perceived too great a risk that she would walk away notwithstanding its security provisions.

On November 7 the public guardian, with Farr's concurrence, placed Brookhouser at Serene Chateau, an unlocked board and care facility operated by a woman named Jackson. It was stipulated at trial that Farr did not tell Jackson about Brookhouser's Rose Acres placement. The evidence is in dispute as to whether Farr gave Jackson any other information concerning Brookhouser's tendencies to walk away and to become disoriented once she had done so. Jackson testified that she was not so informed, and the jury could rationally have believed Jackson's testimony.

On November 8 Brookhouser left Serene Chateau, found a car with a key in the ignition switch, and drove the car to a store where she was arrested. Police took her to a hospital crisis intervention team. Farr was notified; she recommended that Brookhouser be psychiatrically evaluated and that she be hospitalized if found to be psychotic or jailed if not. The crisis intervention team concluded Brookhouser was not psychotic; the police did not jail her but instead returned her to Serene Chateau with Jackson's consent.

Farr then arranged a meeting, at Serene Chateau on November 10, among Brookhouser, her parents, Jackson, Farr, and the public guardian. At the meeting Brookhouser was told that "if she wanted to remain in the community, she needed to cooperate with [Jackson], and she needed to stop doing

[things] like going out and stealing a car, walking away, going away from the facility without permission, not returning when she was supposed to return." She was told that she needed to have Jackson's permission in order to leave Serene Chateau. She was told that if she did not cooperate the public guardian would ask the superior court to send her back to Napa State Hospital. At first Brookhouser was uncommunicative, but by the end of the meeting she "agreed to comply with all the conditions that were being placed upon her."

The parties disagree as to whether Brookhouser had in fact received permission to leave on November 8. Jackson testified that she could not recall any time when Brookhouser left the home without permission and that Brookhouser "had asked permission to go that evening."

A few hours after the November 10 meeting Brookhouser again left Serene Chateau, apparently with the permission of Jackson's mother who had been left in charge. Brookhouser went to a local restaurant. When she behaved oddly in the restaurant police were called; Brookhouser was returned to Serene Chateau. Jackson's initial impression was that Brookhouser had approached the police, and that she had done so because she was unsure how to get back to Serene Chateau. On this basis Jackson concluded that Brookhouser "had done very well" and did not report the incident to anyone.

On November 14 Brookhouser went on her own to visit a doctor, returned to Serene Chateau on her own, and thereafter participated constructively in a group meeting attended by Farr.

On the morning of November 15 Brookhouser failed to clean herself after using the toilet and needed to be directed to clean herself and to change her clothes. Jackson did not view this as a sign of mental deterioration. About 2 p.m. Jackson went to a dental appointment, leaving her mother in charge. Thereafter Brookhouser asked Jackson's mother for permission to leave Serene Chateau to go shopping. Jackson's mother gave the requested permission but told Brookhouser that dinner was to be at 5:30 p.m. and that she wanted Brookhouser to be back at that time for dinner.

Brookhouser did not return. At 6:30 p.m. Jackson reported Brookhouser's absence to police. On November 16 Jackson notified Farr and the public guardian that Brookhouser was missing.

Shortly before dark on the afternoon of November 17, Brookhouser walked down the driveway of a home adjoining the coast highway north of Santa Cruz. A resident of the home noted that she was walking slowly and

"kind of wobbly." Brookhouser indicated to the resident that she was hungry and wanted food. The resident told her that he could not help. After a few minutes Brookhouser walked slowly back up the driveway and out onto the highway where she was struck and gravely injured by an automobile.

Brookhouser initially sued only the motorist (on automobile-tort theories), Jackson (on inadequate-supervision theories), and fictitious defendants (on various of these theories).

In the early stages of discovery counsel for Brookhouser decided to pursue, in addition, claims against Farr, the public guardian, and their public-entity employers. In the circumstances of record such claims are circumscribed by the statutory rules that "[n]either a public entity nor a public employee acting within the scope of his [or her] employment is liable for any injury resulting from *determining* in accordance with any applicable enactment . . . [¶] . . . [w]hether to confine a person for mental illness . . . [¶] . . . [or] [t]he terms and conditions of confinement for mental illness . . . ." (Gov. Code, § 856, subd. (a)(1), (2), italics added) and that "[a] public employee is not liable for *carrying out with due care* [such] a determination . . . ." (*Id.*, subd. (b), italics added.) These statutory immunities are subject to the qualification that (in pertinent part) "[n]othing in this section exonerates a public employee from liability for injury proximately caused by his [or her] *negligent or wrongful act or omission in carrying out or failing to carry out* . . . [¶] . . . [a] determination to confine or not to confine a person for mental illness . . . [¶] . . . [or] [t]he terms or conditions of confinement of a person for mental illness . . . ." (*Id.*, subd. (c)(1), (2), italics added.)

Patently to avoid the statutory immunities, and to bring Brookhouser's case within the statutory qualification, counsel amended Brookhouser's complaint to allege (in what were ultimately the seventh, eighth, and ninth counts of her second amended complaint) that Farr and the public guardian had "determined to place . . . Brookhouser for care in a locked mental health facility," that for enumerated reasons "a locked mental health facility was appropriate and an unlocked board and care home or other facility was inappropriate for . . . Brookhouser," and that after having made the determination Farr and the public guardian proximately caused Brookhouser's injuries by means of three separately specified types of negligent or wrongful acts or omissions:

In her *seventh count* Brookhouser alleged that Farr and the public guardian had negligently or wrongfully failed to carry out their determination to place her in a locked facility.

In her *eighth count* Brookhouser alleged that "[o]n or about November 7, 1977, . . . [the public guardian] and . . . Farr placed plaintiff for board and

care in an unlocked facility, Serene Chateau. Said defendants were negligent in carrying out their placement of plaintiff at Serene Chateau in that said defendants failed to adequately communicate or advise the owners and operators of Serene Chateau of [Brookhouser]'s prior psychiatric history, and particularly her AWOL risk, her rejection for placement by Santa Cruz Care and Guidance Center (a locked facility), and her history of being found in public places placing herself in danger, including walking on the freeway barefoot in the rain."

In her *ninth count* Brookhouser alleged that Farr and the public guardian had acted negligently or wrongfully in carrying out the placement of Brookhouser at Serene Chateau by failing to make adequate findings of suitability required of *the facility licensee* by applicable administrative regulations.

Brookhouser acknowledges that the judgment appealed from is based on her eighth count. On appeal following the first trial of this matter, the First Appellate District determined in an unpublished opinion that the ninth count was properly dismissed because the cited regulations "did not impose an actionable duty" upon Farr or the public guardian as distinct from the facility licensee. At the second trial the jury rejected Brookhouser's seventh count by finding, in a special verdict, that Farr and the state did *not* negligently fail to carry out a determination to confine Brookhouser in a locked facility.

The eighth count is not wholly clear. We agree with Farr and the state that in light of Government Code section 856 they could not be liable for a *determination* to place Brookhouser in either a locked or an unlocked facility. We are satisfied, however, that the eighth count could reasonably have been read as an allegation of *negligent implementation* of either, or both, of (1) a determination to place Brookhouser in a *locked* facility, or (2) a determination to place Brookhouser in the *unlocked* Serene Chateau facility.

At the first trial the trial court determined that the eighth count exceeded the scope of Brookhouser's California Tort Claims Act claims and therefore should be dismissed. On appeal the First Appellate District carefully analyzed the eighth count and concluded that the trial court had erred. Farr and the state now argue that Brookhouser's Tort Claims Act claims asserted, and by virtue of the First Appellate District's analysis the eighth count must now be construed to allege, only negligent implementation of a determination to place Brookhouser in a *locked* facility, and that as so construed the eighth count must be deemed rejected by the jury's special verdict.

Neither Brookhouser's Tort Claims Act claims nor the First Appellate District opinion is wholly clear on the point. There is room to argue, as

Brookhouser does, that within limits set by the claims and the opinion the eighth count properly and sufficiently alleges negligent implementation of a determination to place Brookhouser at Serene Chateau, and thus avoids both the statutory immunity and the jury's special verdict. To give Brookhouser the benefit of any doubt we shall, for purposes of analysis, accept her construction of the eighth count.

The only evidence of negligent implementation was that Farr and the state had failed to give Jackson relevant information at the time of placement.

The trial court instructed the jury that "[i]t has been stipulated by counsel and established by the evidence that the State of California through . . . Farr failed to advise Serene Chateau of the prior placement at Rose Acres. [¶] It has been further established through the evidence, and you are directed by this Court to find, that the foregoing is a breach of the standard of care by the State of California. A breach of the standard of care is negligence."

At the end of the second trial, counsel for Brookhouser for the first time asked that the jury be informed of the provision of Welfare and Institutions Code former section 10053.8, as it read in 1977, that "[i]n facilitating the release of mentally disordered patients or persons who have been mentally disordered patients to suitably licensed facilities, the State Department of Health shall provide the licensee with information concerning the previous conduct of the patients which would be relevant in determining the suitability of the particular facility for the patient and the suitability of placement of such patient in such facility." (Stats. 1975, ch. 694, § 29, p. 1653.) The court read the requested language and also instructed the jury, on Brookhouser's request, that "[i]f you find that a party to this action violated . . . the statute just read to you, and that such violation was a legal cause of injury to another, you will find that such violation was negligence."

The trial court's special verdict form put three questions to the jury relevant to the basic liability issues under the eighth count:

"Question No. 3: The Court has instructed you that . . . Farr and the State of California negligently failed to provide information about . . . Brookhouser's prior placement at Rose Acres to . . . Jackson . . . , the operator of Serene Chateau. [¶] Was this negligence of . . . Farr and the State of California a legal cause of injury to plaintiff . . . Brookhouser?" The jury answered "No."

"Question No. 4: Did . . . Farr and the State of California violate Welfare and Institutions Code Section 10053.[8] by failing to give . . . Jackson

information about . . . Brookhouser's previous conduct relevant to the suitability of her placement at Serene Chateau." The jury answered "Yes."

"Question No. 5: Was the violation of Welfare and Institutions Code Section 10053.[8] by . . . Farr and the State of California found in Question No. 4 a legal cause of injury to plaintiff . . . Brookhouser?" The jury answered "Yes."

In another special verdict the jury found Brookhouser's damages (before offset for settlement with other defendants) to have been nearly $2.7 million. On the basis of the special verdicts the trial court entered judgment for Brookhouser for this amount less the amounts of prior settlements. Necessarily the court concluded that findings that Farr and the state had violated Welfare and Institutions Code, former section 10053.8 (implicitly by failing to provide Jackson with unspecified relevant information other than the fact she had walked away from Rose Acres), and that the violation had been a legal cause of Brookhouser's injury, were sufficient to support judgment for Brookhouser.

Farr and the state challenge the judgment on several grounds. We find two of them persuasive; we shall agree with Farr and the state:

(1) That the evidence of record is insufficient to support the jury's finding that Farr's perceived violation of Welfare and Institutions Code, former section 10053.8 caused Brookhouser's injuries; and

(2) That Farr and the state are immune from liability for Brookhouser's injuries because, at the time she was injured, Brookhouser was "an . . . escaped person who has been confined for mental illness" within the meaning of Government Code section 856.2.

Either of our conclusions would warrant reversal of the judgment. We shall direct the trial court to enter judgment for Farr and for the state.

### Welfare and Institutions Code Section 10053.8

The substance of Welfare and Institutions Code section 10053.8 was added to the codes (as § 10053.5) in 1967, was twice renumbered, and (as § 4012.6) was repealed in 1991. As it read in 1977, section 10053.8 collected a number of generally related provisions for state support of local care for mentally retarded, developmentally disabled, and mentally disordered patients released or diverted from state hospitals. The language on which Brookhouser relied was taken from the last of 14 paragraphs of the lengthy statute.

■ Farr and the state argue, based on other provisions of Welfare and Institutions Code, former section 10053.8, that the language Brookhouser quoted was not applicable to the circumstances of record. We are not persuaded by their premise that section 10053.8, as it read in 1977, was so cohesive as to require that each of its provisions be deemed qualified by each other provision. We are willing to assume the language Brookhouser quoted could rationally have been understood as an essentially independent provision broad enough to have been applicable to Brookhouser's situation.

We are considerably more concerned by the question whether the failure of Farr and the state to provide information to Jackson can be said to have breached a duty of care owed to Brookhouser.

But even were we to assume that Farr and the state owed, and breached, a duty to Brookhouser based either in Welfare and Institutions Code, former section 10053.8 or in general law, we would in any event conclude that the evidence of record was insufficient to establish that the breach *caused* Brookhouser's injuries.

■ It is axiomatic that a defendant cannot be held liable in tort for an injury he or she did not cause. There are two widely recognized tests for determining whether a defendant's conduct has in fact caused the plaintiff's injury: Whether the injury would not have occurred *but for* the defendant's conduct, and whether the defendant's conduct was a *substantial factor* in bringing about the injury. (*Maupin* v. *Widling* (1987) 192 Cal.App.3d 568, 573 [237 Cal.Rptr. 521].) The Supreme Court's recent disapproval of BAJI No. 3.75, on the ground that its use of the term "proximate cause" may confuse or mislead jurors in their determination of cause in fact (*Mitchell* v. *Gonzales* (1991) 54 Cal.3d 1041, 1050, 1052, 1054 [1 Cal.Rptr.2d 913, 819 P.2d 872]), does not appear to alter these two tests for cause in fact. (Cf. *id.* at pp. 1049, fn. 4, 1053, fn. 10.) The Supreme Court does appear to have disapproved use of the substantial factor test to assess legal or policy considerations beyond cause in fact itself. (*Id.* at pp. 1053, 1056-1062 (dis. opn. of Kennard, J.).)

It is apparent that, given the other elements of a claim for negligence, a defendant will be liable only if the injury would not have occurred *but for* his or her conduct. But even if the defendant's conduct meets the but-for test of causation, he or she may not be liable if there is more than one but-for cause of the injury and the defendant's conduct (although strictly speaking a cause) was not a *substantial factor* in bringing about the injury. (Cf. 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 966, pp. 355-356, quoting from Rest.2d Torts, § 431 and comments; *Mitchell* v. *Gonzales, supra,* 54 Cal.3d at pp. 1052-1053; *Fraijo* v. *Hartland Hospital* (1979) 99 Cal.App.3d 331,

346-347 [160 Cal.Rptr. 246].) We shall conclude that the evidence of record does not establish even the threshold requirement that the conduct of Farr and the state have been a but-for cause of Brookhouser's injuries.

■ To assess the sufficiency of Brookhouser's proof we must search the entire record to determine whether there is evidence which, when considered in the context of all other evidence in the case (cf. *Rivard* v. *Board of Pension Commissioners* (1985) 164 Cal.App.3d 405, 410-412 [210 Cal.Rptr. 509]), is (in the often quoted language of *Estate of Teed* (1952) 112 Cal.App.2d 638, 644 [247 P.2d 54]) "of ponderable legal significance, . . . reasonable in nature, credible, and of solid value . . . ," to support the jury's finding of cause. Once we have determined that there is or is not such evidence our task will be completed: We do not resolve conflicts in the evidence, or between inferences reasonably deducible from the evidence. (Cf. generally *Bowers* v. *Bernards* (1984) 150 Cal.App.3d 870, 873 [197 Cal.Rptr. 925], citing many cases.) That we might, as triers of fact, have decided the case differently would be wholly irrelevant to our appellate function.

■ The evidence—essentially the testimony of Jackson—and the stipulation on which Brookhouser relied to show that Farr and the state had not informed Jackson of Brookhouser's documented tendencies to walk away, and to become disoriented when she had done so, was undeniably reasonable in nature and credible. As we have pointed out, the jury could rationally have believed the evidence. In our view, however, the evidence has no measurable tendency to prove that the failure to inform Jackson in fact *caused* Brookhouser's injuries: The evidence lacked (in *Teed*'s words) "ponderable legal significance" and "solid value" with respect to cause.

Suppose Farr had given Jackson Brookhouser's entire medical record, including a full description of Brookhouser's tendencies to walk away and to become disoriented, and that Jackson had read the record, before Jackson decided whether to accept Brookhouser at Serene Chateau.

The information in Brookhouser's record could have had no relevant impact on the manner in which Jackson would have cared for Brookhouser, had Jackson nevertheless decided to accept her: By Jackson's own testimony, by law she could not wholly forbid a patient's temporary departures from her unlocked facility. She could do no more than to ask, as she and her mother did in Brookhouser's case, that the patient abide by reasonable conditions as to the length of her absences and the times for her return.

Farr and the state point out that once Jackson did decide to admit Brookhouser, she was almost immediately put on notice of Brookhouser's

tendency to walk away: Within the first 10 days, Brookhouser had twice left Serene Chateau and on each occasion had become a subject of police intervention. On the first occasion she stole an automobile; Farr convened a meeting, attended by Jackson, at which Brookhouser was confronted with the need to cooperate or face further court proceedings and was specifically told (among other things) that she must obtain permission before leaving Serene Chateau. Within a few hours she again left and was brought back by police. Brookhouser argues that none of these events sufficed to put Jackson on notice that, *once she had walked away*, Brookhouser tended to become disoriented and less able to care for herself. On the other hand, Brookhouser's medical records would not necessarily have informed Jackson that Brookhouser would be unable to care for herself: Throughout her long history of walking away Brookhouser's disorientation had manifested itself in bizarre behavior, but she had apparently succeeded in functioning on her own for as much as several months at a time. And in the course of her two weeks at Serene Chateau Brookhouser showed some signs of increasing responsibility: She acknowledged the warnings she received at the November 10 meeting; before she left a few hours later she requested and received permission as she had been warned to do; on November 14 she successfully went to and returned from a medical appointment. In short there is no rational support for an inference that Jackson, had she been fully aware of Brookhouser's medical history at the outset but nevertheless elected to accept Brookhouser at Serene Chateau, would and could have taken effective steps to prevent the kind of accident in which Brookhouser was injured.

Perhaps Jackson, with full knowledge of Brookhouser's medical record, would have decided not to accept Brookhouser at Serene Chateau. This itself is by no means a foregone conclusion: Jackson was in the business of caring for mentally ill persons and Brookhouser's record of wandering and disorientation was not inconsistent with mental illness and had never previously resulted in physical harm to Brookhouser or, presumably, in liability for a mental health facility. Had she been aware of it, Jackson might have been concerned by the fact that a *locked* facility had turned Brookhouser away, but the inference that Jackson would also have refused to accept Brookhouser is by no means strong.

Assuming, however, that Jackson had not accepted Brookhouser at Serene Chateau, it does not follow that Brookhouser would not have been injured, sooner or later, in the course of an unauthorized absence from a mental health facility, by a car on a highway.

In the first place, it is conjectural to suppose that Brookhouser would have been placed in a locked facility had Jackson not accepted her. Placement

decisions within Santa Cruz County were within the public guardian's discretion, upon such consideration as he might choose to give to the discretionary advice of Farr as Brookhouser's case manager. Placements outside of Santa Cruz County—at, for example, Napa State Hospital—would have required an additional discretionary decision by the superior court.

Nor would it follow that even a placement in a locked facility would have averted the kind of accident in which Brookhouser was injured. At least twice before, according to the medical records, Brookhouser had succeeded in walking away from locked facilities—Napa State Hospital on one occasion and the Santa Cruz County neuropsychiatric ward on another—by first gaining access to an unlocked area of the facility.

Finally, and sadly, the class of victims of the kind of accident in which Brookhouser was injured cannot rationally be limited to mentally ill persons such as Brookhouser. Aside from the fact she had once previously been seen walking on a highway during one of her absences, there was nothing in Brookhouser's medical records to suggest she was more or less likely to be injured by an automobile than any other of the unacceptably large number of pedestrians, of all ages and mental conditions, who are injured or killed on our streets every year. Regardless of her medical history Brookhouser might, or might not, have been injured on this or some other street or highway, in this or some other county.

In sum we find no rational basis for a determination that Brookhouser's accident was in fact caused by a failure fully to inform Jackson, at the time she accepted Brookhouser at Serene Chateau, of Brookhouser's medical history.

### Government Code Section 856.2

Subdivision (a)(2) of Government Code section 856.2 provides that "[n]either a public entity nor a public employee is liable for: [¶] . . . [¶] (2) An injury to, or the wrongful death of, an escaping or escaped person who has been confined for mental illness or addiction." The statute does not require, as a condition of the immunity, that the confinement have been directly administered or managed by the public entity or public employee: In the abstract, the immunity would apply to an escape from confinement in a private mental health facility such as Serene Chateau.

Farr and the state raised the Government Code section 856.2 immunity at the second trial, arguing that Brookhouser should have been deemed an "escaped person," within the meaning of the section, at the time she was injured.

██ ██ Brookhouser argues, essentially preliminarily, that Farr and the state should not have been permitted to raise the immunity (1) because the First Appellate District's opinion on the first appeal implicitly established, as law of the case, that the immunity did not apply, and (2) because both Farr and the state should be deemed to have waived the immunity or to be estopped to raise it at the second trial.

Neither point is persuasive.

██ It appears that the state never pled the Government Code section 856.2 immunity, that Farr (having pled it) did not raise the immunity at the first trial, and that the immunity was neither raised on appeal nor discussed in the First Appellate District's opinion. These facts effectively vitiate Brookhouser's law-of-the-case argument. As a general rule "the doctrine does not apply to points of law that might have been, but were not determined on the prior appeal." (*Nally* v. *Grace Community Church* (1988) 47 Cal.3d 278, 302 [253 Cal.Rptr. 97, 763 P.2d 948]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 753, p. 721.) Appellate courts should not be deemed to have passed upon matters of defense which, for whatever reason, the defendants have chosen not to raise either at trial or on appeal.

██ Nor should the defendants be deemed foreclosed to assert the immunity at the second trial.

Farr had pled the immunity; the state had not. The immunity is expressly extended not only to the public entity but also to its employee, and is one of the many immunities subject to the general statutory rule that "a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability." (Gov. Code, § 815.2, subd. (b); cf., generally, Cal. Government Tort Liability Practice (Cont.Ed.Bar 1992) §§ 2.10, 2.63, 2.112, pp. 79, 137-138, 208.) Whether or not there would have been a waiver had neither Farr nor the state pled the immunity (compare *McMahan's of Santa Monica* v. *City of Santa Monica* (1983) 146 Cal.App.3d 683, 689 [194 Cal.Rptr. 582], with *Buford* v. *State of California* (1980) 104 Cal.App.3d 811, 826 [164 Cal.Rptr. 264]; cf. Cal. Government Tort Liability Practice, *supra*, § 2.113, pp. 208-210), where as here the employee has pled an immunity such as that stated in Government Code section 856.2 the issue of the entity's immunity is sufficiently raised and the entity's failure separately to allege the immunity is of no moment.

Nor are we persuaded by the argument that, in essence, Farr was required to litigate the immunity at the first trial if at all. The crux of Brookhouser's

argument appears to be that it would be "grossly unjust" to permit Farr to raise the escape immunity now if, by expressly raising it in the earlier proceedings, Farr could have resolved the issue and saved the "emotional and financial expense" of the second trial. But Farr, who prevailed at the first trial, may be assumed to have supposed she need not rely on the immunity. The First Appellate District's reversal set this matter " 'at large' for further proceedings as though it had never been tried." (9 Witkin, Cal. Procedure, *supra*, Appeal, § 625, pp. 606-607.) It was Brookhouser's choice to proceed to the second trial; at the second trial Farr was surely at liberty, in light of the reversal, to augment her case by asserting any properly pled immunity.

 The trial court took cognizance of the escape immunity and submitted it to the jury for a factual determination, instructing the jury without objection that Brookhouser had been "confined" at Serene Chateau as a matter of law. (Cf. *Los Angeles County-U.S.C. Medical Center* v. *Superior Court* (1984) 155 Cal.App.3d 454, 460-461 [202 Cal.Rptr. 222]; *Forde* v. *County of Los Angeles* (1976) 64 Cal.App.3d 477, 479-480 [134 Cal.Rptr. 549]; cf. also *Buenavista* v. *City and County of San Francisco* (1989) 207 Cal.App.3d 1168, 1173 [255 Cal.Rptr. 329].)

But the court also engrafted a requirement that the escape have been *willful*, instructing the jury that "[t]o escape or to be escaping is a willful act. [¶] The word 'willfully' when applied to the intent which [*sic*] an act is done means with a purpose or willingness to commit the act in question. [¶] Whether or not plaintiff's leaving Serene Chateau and not returning as directed is a willful escape or is willfully escaping is for your determination." The court also asked the jury, by special verdict form: "Question No. 6: At the time . . . Brookhouser was injured had she willfully escaped or was she willfully escaping from Serene Chateau?" The jury answered "No."

Farr and the state argue that escape, within the meaning of Government Code section 856.2, does not include an element of willfulness and therefore the court's instruction embodied an error that nullifies the special verdict.

Brookhouser responds that any arguable error in the instruction was harmless. She relies primarily on an assertion that because she had the *permission* of Jackson's mother to leave Serene Chateau on November 15 she cannot be said to have been an escaped person when she was injured on November 17.

We conclude that willfulness is not an element of the kind of escape to which Government Code section 856.2 refers and that Brookhouser had escaped at the time she was injured.

The legislative history of Government Code section 856.2 makes clear that the Legislature was concerned not with whether a particular mental patient could or would appreciate that he or she should not leave confinement but rather that public entities and employees should be able to make confinement decisions solely on the basis of each patient's medical needs: In the words of one legislative committee, "[t]he extent of freedom that must be accorded persons suffering from mental illness or addiction, and the nature of the precautions necessary to prevent escape of such persons, are matters that should be determined by the proper public officials unfettered by any fear that their decisions may result in liability." (Sen. Comm. on Judiciary Rep. on Sen. Bill No. 42, 4 Cal. Law Revision Com. Rep. (1963) pp. 225, 236.)

■ The *crime* of escape requires concurrence of an *act* of "unlawful departure from the limits of custody" (*People* v. *Davis* (1985) 166 Cal.App.3d 760, 764, fn. 3 [212 Cal.Rptr. 673]; *People* v. *Quijada* (1921) 53 Cal.App. 39, 41 [199 P. 854]) and a general criminal intent (cf. *People* v. *Hayes* (1971) 16 Cal.App.3d 662, 666-668 [94 Cal.Rptr. 222]) sometimes defined in terms of willfulness (e.g., Pen. Code, § 4532; cf. *Yost* v. *Superior Court* (1975) 52 Cal.App.3d 289, 293-294 [125 Cal.Rptr. 74]).
■ Plainly, the Legislature, in Government Code section 856.2, intended to refer not to the crime of escape (or, indeed, to any aspect of the patient's animus or responsibility for his or her own actions) but rather to the simpler question whether the patient had physically exceeded the scope of previously imposed legitimate limitations and controls. The Legislature knew it was speaking of mentally ill persons, and must have understood that in some if not many cases the mentally ill person would lack the ability to form an intent or the will to escape. The Legislature must be deemed to have been concerned less with the intent of the patient than with the practicality and the wisdom of requiring that, to avoid liability, facility managers, and public officials involved in decisions bearing on limitations and controls, inflexibly restrict the patient's freedom. We conclude that a mental patient may be "an escaping or escaped person," within the meaning of section 856.2, even if he or she does not intend to escape and even if he or she does not and cannot understand that he or she is in fact escaping.

■ We further conclude that the plain legislative intent to vest facility managers and public entities and employees with broad discretion to determine degrees of control, without concern for liability, connotes a comparably broad concept of physical escape: If any particular form or degree of control can be said to be reasonable in the circumstances, and thus within the sound discretion of the manager or official, then any departure from that control, not explicitly or implicitly authorized by the manager or official, may be regarded as an escape within the meaning of Government Code section 856.2.

In opposition to our construction of Government Code section 856.2 Brookhouser cites Welfare and Institutions Code sections 1768.7, 7325 and 7326, each of which explicitly refers not only to escape but also to return, or failure to return, from an authorized absence. In Brookhouser's view, inclusion of these explicit references in other statutes makes plain that had the Legislature intended to extend immunity to instances of failures to return it could and would have amended Government Code section 856.2 to so provide, and that such an amendment should be left to the Legislature and not effected by "judicial legislation." In support of this reasoning Brookhouser cites *In re Thanh Q.* (1992) 2 Cal.App.4th 1386 [4 Cal.Rptr.2d 19], which construed Welfare and Institutions Code section 871. Section 871 refers only to escape and not to failure to return; in an opinion which contrasted section 871 to section 1768.7 and also to Penal Code section 4532, *Thanh Q.* held that section 871 did not extend to a failure to return. (2 Cal.App.4th at pp. 1388-1390.)

We find Brookhouser's argument unpersuasive. ■ We acknowledge the principle, quoted in *Thanh Q.*, that " '[w]here a statute, with reference to one subject contains a given provision, the omission of such provision from a similar statute concerning a related subject . . . is significant to show that a different intention existed.' " (*People* v. *Valentine* (1946) 28 Cal.2d 121, 142 [169 P.2d 1]; cf. *In re Thanh Q., supra*, 2 Cal.App.4th at p. 1389.) ■ But here the statutes Brookhouser cites are neither similar nor related to Government Code section 856.2 in the requisite sense. Welfare and Institutions Code sections 1768.7 and 7326, like Penal Code section 4532, define *crimes* of escape; Welfare and Institutions Code section 7325 defines and necessarily limits the circumstances in which a peace officer may *arrest* an escapee without a warrant. None of these sections relates to *immunity*, or to the considerations of *immunity policy* we find significant.

Brookhouser also relies on *Buford* v. *State of California, supra*, 104 Cal.App.3d 811, and on *Forde* v. *County of Los Angeles, supra*, 64 Cal.App.3d 477. Both cases state valid rules, but each is distinguishable from the one before us.

*Buford* holds that a mental patient released from institutional control on an *indefinite* leave of absence cannot thereafter be retroactively rendered an escapee by a unilateral institutional decision to change his leave from indefinite to "unauthorized." (104 Cal.App.3d at pp. 824-825.) Conversely, a patient who has walked away from institutional confinement must be deemed to have escaped, within the meaning of Government Code section 856.2, regardless of a subsequent unilateral institutional decision to grant him a retroactive "extended pass." (*Forde* v. *County of Los Angeles, supra*, 64

Cal.App.3d 477, 479-480.) Brookhouser asks us to generalize from *Buford* and *Forde* that it is the confinement status of the patient at the time he or she first physically leaves a confinement *facility* that irrevocably determines whether he or she has escaped, and to conclude that because on November 15 she left Serene Chateau with the permission of Jackson's authorized representative she was not, and could not thereafter become, an "escaped person."

In light of the statutory scheme Brookhouser's view of departure from confinement is too mechanical. *Buford* and *Forde* are valid examples of coincidence between departure from the *facility* and departure from *control*, but do not establish that the coincidence will be invariable. If the purpose of encouraging constructive management of mental patients is to be served, the concepts of control and thus of escape must be more flexible. In the case before us it was a part of Brookhouser's treatment plan, as a patient confined in an unlocked residential facility, that she be permitted to take short excursions into the community. When Brookhouser left the facility on November 15, with permission to be gone, not indefinitely as in *Buford* but only *until 5:30 p.m.*, she remained under the facility's control, extended in the facility's discretion to permit a *finite* excursion. It was when Brookhouser *did not return at 5:30 p.m.* that she departed from previously imposed legitimate limitations and controls and thus became "an escaping or escaped person."

Our perception that, in circumstances such as these, a mental patient may remain within the facility's control even when physically absent from the facility, is consistent with the decisions of other courts in other contexts that special limited-release programs legitimately part of longer periods of confinement may themselves be regarded as forms of confinement. (Cf., e.g., *People* v. *Haskins* (1960) 177 Cal.App.2d 84, 87 [2 Cal.Rptr. 34] [work furlough program]; *People* v. *Labrum* (1972) 25 Cal.App.3d 105, 108-109 [101 Cal.Rptr. 602] ["temporary community release"].)

Brookhouser calls to our attention the precept that "courts should not casually decree governmental immunity . . . ." (*Johnson* v. *State of California* (1968) 69 Cal.2d 782, 798 [73 Cal.Rptr. 240, 447 P.2d 352].) We can only respond that our construction of Government Code section 856.2 appears to us to be dictated by sound principles of statutory construction and is by no means casual. We feel deep sympathy for Brookhouser as a gravely injured human being, but we are obliged to follow the law.

Brookhouser argues that our broad definition of escape would depend on the patient's ability to comprehend that he or she was required to return, and

thus would necessarily imply a mental element akin to a willful decision not to return. She further argues that our definition would unfairly extend to a patient who for physical reasons beyond his or her control *could not* return. These arguments once again disregard the distinction between criminal escape and the departure from control to which Government Code section 856.2 is addressed. If *for whatever reason* the mental patient does not respond to reasonably imposed controls and therefore finds himself or herself in a position to injure or to be injured, the legislative purpose of encouraging reasonable use of methods of control requires that immunity be extended. Immunity is extended not because the patient's departure, or his or her failure to return, was willful or in any other sense wrongful, but because reasonable decisions as to how to control particular patients should not be chilled, at the time they are made, by the prospect of liability. The critical question is whether the limitations or controls from which the patient walked away were reasonable in their inception.

In all the circumstances here it was reasonable as a matter of law for Jackson's mother to permit Brookhouser to go shopping, and to impose, and to expect Brookhouser to abide by, a direction to return by 5:30 p.m. Brookhouser's failure to return constituted her an "escaped person" within the meaning of Government Code section 856.2 regardless *why* she did not return. She remained an "escaped person" at the time of her injuries two days later.

It follows that Farr and the state are immune from liability for Brookhouser's injuries.

The judgment is reversed, and the matter is remanded with directions to enter judgment for defendants Ellen Mary Farr and the State of California. Each side shall bear her or its own costs on appeal.

Capaccioli, Acting P. J., and O'Farrell, J.,* concurred.

Respondent's petition for review by the Supreme Court was denied February 11, 1993.

---

*Judge of the Monterey Superior Court sitting under assignment by the Chairperson of the Judicial Council.